1
2
3
4
5
6

Robert Fish (SBN 149711)
rfish@fishiplaw.com
John van Loben Sels (SBN 201354)
jvanlobensels@fishiplaw.com
Jennifer J. Shih (SBN 276225)
jshih@fishiplaw.com
FISH IP LAW, LLP
2603 Main Street, Suite 1000
Irvine, California 92614
Telephone:   (949) 943-8300
Facsimile:    (949) 943-8358

7    *Attorneys for Defendant*

8
9    **UNITED STATES DISTRICT COURT**
10   **CENTRAL DISTRICT OF CALIFORNIA**

11   DENNIS FUGNETTI,

12                    Plaintiff,

     v.

13   BIRD B GONE, INC.; and DOES 1-10,
14   inclusive,

15                    Defendant

16

Case No.: 8:19-cv-00847-AG (DFMx)

**DECLARATION OF BRUCE
DONOHO IN SUPPORT OF
DEFENDANT'S OPPOSITION**

Hon. Andrew Guilford

Hearing Date: September 16, 2019
Hearing Time: 10:00 a.m.
Courtroom: 10-D

17
18
19
20
21
22
23
24
25
26
27
28

1.      I submit this declaration in support of BBG's Opposition to Motion to Strike.

2.      I am the founder and President of Bird-B-Gone, Inc. ("BBG").  I founded the company in 1992.

3.      Today, BBG has grown to be the world's largest manufacturer of professional grade bird deterrents and has expended considerable resources researching, developing, and obtaining worldwide intellectual property protection for its deterrent devices.

4.      From approximately 1996 until approximately 2004, BBG retained MIAD Photography ("MIAD") on a project-by-project basis for certain marketing projects.  It is my understanding that MIAD is owned at least in part by the plaintiff, Dennis Fugnetti.  During that time frame, Mr. Fugnetti was the primary point person at MIAD with whom I and my staff interacted.

5.      BBG worked on at least ten (10) projects with Fugnetti/MIAD during the 1996 to 2004 time period.  I was personally involved in those projects, along with my colleague, Stephanie Fitzpatrick, BBG's Marketing Director at the time.

6.      There were numerous meetings among myself, Fugnetti, and Ms. Fitzpatrick, before the idea of the Flying Pigeon Image was even discussed.  We had various meetings about BBG's products and we worked together on a project by project basis to design marketing materials for bird control products.

7.      On or about mid-1999, Ms. Fitzpatrick and I met with Fugnetti at our office located at 22511 Aspan Street, Lake Forest, CA 92630.  Ms. Fitzpatrick and I told Fugnetti we needed an action picture of a pigeon flying so that we could illustrate in BBG's marketing materials the function of BBG's deterrent devices. We expressly told Fugnetti that we wanted the image for use in marketing and packaging materials for BBG's bird deterrent products going forward. Specifically, I told Fugnetti that I needed an image of a bird trying to land on something and not

1

DONOHO DECLARATION

1  being able to do so. I told Fugnetti that what I wanted was a bird image that BBG
2  could use going forward in whatever advertising and marketing materials we chose
3  to produce and use.

4         8.     Fugnetti agreed without reservation.  He said, "Fine.  Ok."  Then he
5  set a price of around $600.00 for the photographs and for right to use the right to
6  use those photographs going forward in BBG's marketing materials as BBG saw
7  fit.  It was this agreement that led to the creation by Fugnetti and use by BBG of
8  the Pigeon Image that is at issue in this case.  At no time during our initial
9  discussions, or at any time afterwards, did Fugnetti attempt to limit or restrict
10  BBG's right to use the Flying Pigeon Image as we saw fit for bird control products.

11         9.     MIAD invoiced BBG the agreed upon set price of around $600.00 for
12  the photographs and the unlimited right to use those photographs going forward
13  just as I had agreed with Fugnetti.  If Fugnetti had attempted to limit BBG's ability
14  to use the Flying Pigeon Image going forward, we would have never done the deal
15  with MIAD at all.  After all, BBG would have had no business need for a picture of
16  a pigeon flying that it could not use in its business, and certainly would not have
17  paid the agreed upon price for such a photo.

18        10.    BBG then paid MIAD the entire invoice amount for the photographs
19  taken from the photography session and for the right to use selected bird images,
20  including the Flying Pigeon Image for BBG's marketing materials going forward.

21        11.    Fugnetti never attempted to limit BBG's scope of use for any of the
22  photographs, including the Flying Pigeon Image.  In fact, BBG commissioned
23  MIAD for several projects after creation of the Flying Pigeon Image which used
24  the Flying Pigeon Image, and BBG paid MIAD separately for that work.  That is,
25  BBG commissioned MIAD to create marketing materials that used the Flying
26  Pigeon Image.  BBG would never have paid MIAD the agreed upon price for a
27  print of the Flying Pigeon Image (as Fugnetti's claim suggests) if BBG had to pay

28

DONOHO DECLARATION

MIAD again for every marketing product that used the Flying Pigeon Image. There is no conceivable value to BBG in the false arrangement that Fugnetti describes in his complaint.

12.    MIAD Photography and Fugnetti did not have the Flying Pigeon Image or any other photographs of birds in its portfolio prior to this specific project from BBG; it was created for BBG's use for bird control products.

13.    A week after Fugnetti completed his assignment and took the photographs, Ms. Fitzpatrick and I met again with Fugnetti in our office and we selected one photograph out of the 50 photographs – the Flying Pigeon Image.  A true and correct copy of the photograph is attached hereto as Exhibit A.

14.    Fugnetti knew that the purpose of the photograph would be used in BBG's current and future marketing materials, and Fugnetti never expressed any reservation about any of BBG's planned uses for the Flying Pigeon Image.

15.    Ms. Fitzpatrick and I told Fugnetti that we would be using this photograph with all of BBG's advertisement materials going forward. Specifically, BBG wanted to establish our product in the marketplace and wanted the ability to use the Flying Pigeon Image.  Fugnetti never gave any restrictions on the use of the Flying Pigeon Image nor did he give any restrictions on any of the other photographs.

16.    About a week following the meeting, Fugnetti cleaned up the Flying Pigeon image and we met again in our offices to design the marketing material. Fugnetti knew and consented to the fact that BBG would be using the Flying Pigeon Image in our marketing materials without restriction to use.

17.     Ms. Fitzpatrick and I both made clear to Fugnetti in our conversations during the several meetings that BBG could use the selected bird image as we saw fit.

3

DONOHO DECLARATION

18.     Fugnetti never mentioned to me or anyone else at BBG that he would retain an ownership interest to the Flying Pigeon Image.

19.     In or about 2003 to 2004, BBG stopped using MIAD's services because MIAD Photography could not keep up with the technology.

20.     When we parted ways, Fugnetti did not instruct me to not use the Flying Pigeon Image.

21.     On at least three occasions in or about 2004, Fugnetti personally visited the BBG offices and asked to bid on additional marketing work.

22.     In those meetings, Fugnetti saw – at a minimum – at least three (3) BBG applications of the Flying Pigeon Image which Fugnetti knew he and MIAD had no role in creating.

23.     For instance, BBG displayed multiple product posters with the Flying Pigeon Image all of the walls of our small office, and Fugnetti could not help but to have seen them.  Fugnetti knew that MIAD was not involved in producing the subject posters.  I know that this poster was up during the time period and Fugnetti and I talked about this poster which uses the Flying Pigeon Image.

24.     Fugnetti told Ms. Fitzpatrick and I during each of these office visits that MIAD could make marketing posters like the one in BBG's office and catalogs like the ones we showed him better and cheaper than the company that made the material for BBG.  Fugnetti asked to be able to bid on such work in the future.

25.     Fugnetti never suggested that I had no right to use the Flying Pigeon Image or that the right was restricted in any way for the use of bird control products.

26.     In or about 2004 to 2005, Fugnetti saw at least two BBG catalogs that prominently displayed the Flying Pigeon Image.  Again, Fugnetti and MIAD had

4

DONOHO DECLARATION

1    nothing to do with creating the catalog or any of the product descriptions in that

2    catalog.

3         27.     Again, Fugnetti asked for the opportunity to bid on future catalogs,

4    and he did present bids to BBG.

5         28.     At no time did Fugnetti say to me or Ms. Fitzpatrick that BBG was

6    using the Flying Pigeon Image improperly by including it in BBG's catalogs, or

7    that BBG's use of the Flying Pigeon Image was in violation of the terms of our

8    agreement.

9         29.     This is because Fugnetti knew that BBG purchased from him the right

10   to use the image even in materials that MIAD did not produce.

11        30.     In or about December of 2003, BBG filed for trademark application of

12   the Flying Pigeon Image, registration number 3000872.  A true and correct copy of

13   the registration is attached hereto as Exhibit B.  I sought to obtain protection for

14   the Flying Pigeon Image because it is associated with BBG and I wanted to protect

15   the Flying Pigeon Image with respect to bird deterrent products.

16        31.     Fugnetti stopped coming by our office in or about 2005.

17        32.     Fugnetti never mentioned any restrictions to me or anyone else at

18   BBG regarding the use of the photographs.

19        33.     From a business perspective, I would not have continued to market the

20   Flying Pigeon Image with our bird deterrent products if I did not have the

21   unrestricted right to do so.

22        34.     In or about May of 2017, I learned that certain of BBG's Chinese

23   competitors had knocked off BBG's Flying Pigeon Image for use with their

24   competing goods.

25        35.     I wanted to stop the Chinese competitors from their unlawful use of

26   the Flying Pigeon Image.  I contacted Fugnetti in order to ask him for assistance

27   with the copyright registration for the Flying Pigeon Image.

28

5

DONOHO DECLARATION

36.     Rather than cooperate with my request, Fugnetti went off to file a copyright registration for the Flying Pigeon Image.

37.     I was unaware Fugnetti went behind my back and filed for registration until I received service of his Complaint in February of 2019.

I declare under penalty of perjury under the laws of the United States of America, the foregoing is true and correct. Executed on August  19 , 2019, at Irvine, California.

Bruce Donoho

6

DONOHO DECLARATION