Robert Fish (SBN 149711)
rfish@fishiplaw.com
John van Loben Sels (SBN 201354)
jvanlobensels@fishiplaw.com
Jennifer J. Shih (SBN 276225)
jshih@fishiplaw.com
FISH IP LAW, LLP
2603 Main Street, Suite 1000
Irvine, California 92614
Telephone:  (949) 943-8300
Facsimile:   (949) 943-8358

*Attorneys for Defendant*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENNIS FUGNETTI,<br><br>              Plaintiff,<br>v.<br><br>BIRD B GONE, INC.; and DOES 1-10, inclusive,<br><br>              Defendant | Case No.: 8:19-cv-00847-AG (DFMx)<br><br>**DECLARATION OF STEPHANIE FITZPATRICK IN SUPPORT OF DEFENDANT'S OPPOSITION**<br><br>Hon. Andrew Guilford<br>Hearing Date: November 18, 2019<br>Hearing Time: 10:00 a.m.<br>Courtroom: 10-D<br>Complaint Filed:   May 6, 2019 |

FITZPATRICK DECLARATION

1.\tI submit this declaration in support of BBG's Opposition to Motion to Strike.

2.\tI have been working at BBG for twenty-three years (23) years.  I was the only full-time employee for the first three (3) years since the company was founded in 1992.  Besides marketing, I have also worked in accounting, purchasing, shipping, and sales.  My primary position now is Director of Accounting and I also assist in the marketing department as needed.

3.\tFrom approximately 1996 until approximately 2004, BBG retained MIAD Photography ("MIAD") on a project-by-project basis for certain marketing and graphic design projects.

4.\tIt is my understanding that MIAD is owned in part by the plaintiff, Dennis Fugnetti ("Fugnetti").  During that time frame, Mr. Fugnetti was the primary point person at MIAD with whom I interacted with.

5.\tBBG worked on at least ten (10) projects with Fugnetti/MIAD during the 1996 to 2004 time period.  I was personally involved in those projects, along with BBG's President, Bruce Donoho.

6.\tThere were numerous meetings between Fugnetti, Bruce, and I, to discuss various marketing projects.

7.\tIn or about mid 1999, Mr. Donoho and I met with Fugnetti at our office located at 22511 Aspan Street, Lake Forest 92630.  We told Fugnetti we needed an action picture of a pigeon flying so that we could illustrate in BBG's marketing materials the function of BBG's deterrent devices. Mr. Donoho and I contributed all of the creative work for this project (other than the photography).

8.\tFugnetti agreed and set a price of around $600.00 for the photographs and right to use them going forward in BBG's marketing materials.  At no time during our initial discussions, or at any time afterwards, did Fugnetti attempt to limit or restrict BBG's right to us the Pigeon Image as we saw fit.

1

FITZPATRICK DECLARATION

9. Following BBG's instructions and directions, Fugnetti took around fifty (50) photos of birds in Newport Beach, California, in or about the summer of 1999.

10. The reason we requested him to take so many photos taken was because we wanted an image that we could use on all advertising materials. Fugnetti confirmed that.

11. If Fugnetti had attempted to limit BBG's ability to use the Pigeon Image going forward, we would have never done the deal with MIAD at all.

12. MIAD invoiced us for around $600.00 and we paid in full for the photographs taken from the photography session and for the right to use selected bird images, including the Pigeon Image for BBG's marketing materials going forward.

13. Fugnetti never limited BBG's scope of use for any of the photographs, including the Pigeon Image. In fact, BBG commissioned MIAD for several projects after creation of the Flying Pigeon Image which used the Flying Pigeon Image, and BBG paid MIAD separately for that work.

14. About a week after Fugnetti completed his assignment and took the photographs, Mr. Donoho and I met again with Fugnetti in our office and we selected one photograph out of the 50 photographs.

15. Fugnetti knew that the purpose of the photograph would be used in BBG's current and future marketing materials, and Fugnetti never expressed any reservation about any of BBG's planned uses for the Pigeon Image.

16. Mr. Donoho and I told Fugnetti that we would be using this photograph with all of BBG's advertisement materials. Specifically, BBG wanted to establish our product in the marketplace and wanted the ability to use the Flying Pigeon Image. Fugnetti never gave any restrictions on the use of the Flying Pigeon Image nor did he give any restrictions on any of the other photographs.

17. About a week following the meeting, Fugnetti cleaned up the Flying Pigeon image and we met again in our offices to design the marketing material. Fugnetti knew and consented to the fact that BBG would be using the Flying Pigeon Image in our marketing materials without restriction to use.

18. Fugnetti never mentioned to me or anyone else at BBG that he would retain an ownership interest to the Flying Pigeon Image.

19. With the advent of technology, Fugnetti's services became obsolete, and BBG stopped using Fugnetti/MIAD's services in or about 2003 to 2004.

20. When we parted ways, Fugnetti did not inform me or anyone else at BBG to not use the Flying Pigeon Image.

21. On at least three occasions in or about 2004, Fugnetti personally visited the BBG offices and asked to bid on additional marketing work. I was present at those meetings, along with Mr. Donoho.

22. In those meetings, Fugnetti saw – at a minimum at least three (3) BBG applications of the Flying Pigeon Image that Fugnetti knew he and MIAD had no role in creating.

23. For instance, the BBG displayed multiple product posters with the Flying Pigeon Image all of the walls of our small office. Because the office was a small office at that time, there was no way Fugnetti would have not seen the posters.

24. Fugnetti told Mr. Donoho and I during each of these office visits that MIAD could make marketing posters like the one in BBG's office and catalogs like the ones we showed him better and cheaper than the company that made the material for BBG.

25. Fugnetti never suggested that BBG no right to use the Flying Pigeon Image or that the right was restricted in any way.

26. In or about 2003 to 2004, Fugnetti saw at least two BBG catalogs that prominently displayed the Flying Pigeon Image.

3
FITZPATRICK DECLARATION

27. I personally handed Fugnetti a BBG catalog in 2004. Attached as Exhibit A is an excerpted copy of the catalog which includes the front and back covers as well as the inside back covers which displays the Flying Pigeon Image. The catalog has a date of 2005, but it was distributed in 2004 for the October National Pest Management Association 2004 trade show.

28. When I handed Fugnetti the catalog he said that I would like to bid on the project. Fugnetti later gave me a quote for the bid. But I declined the bid. He never said that BBG had no right to use the Flying Pigeon Image. If he had, BBG would not have continued using the Flying Pigeon Image.

29. Fugnetti also had access to BBG's catalog in 2003. Attached as Exhibit B is an excerpted copy of the catalog.

30. When Fugnetti visited our offices, he also saw the posters that were prominently displayed in our offices.

31. A true and correct copy of a poster showing the Flying Pigeon Image that was displayed in our office taken on or about October 19, 2003 is attached hereto as Exhibit C.

32. A true and correct copy of a poster showing the Flying Pigeon Image that was displayed in our office in or about 2004 is attached hereto as Exhibit D.

33. Fugnetti asked for the opportunity to bid on future catalogs and he did present bids to BBG.

34. At no time did Fugnetti say to me or Mr. Donoho that BBG was using the Flying Pigeon Image improperly or in violation of the terms of our agreement.

35. He knew that BBG had the right to use the image even in materials that MIAD did not produce.

36. Fugnetti stopped coming by our office in or about 2005.

37. Fugnetti never mentioned any restrictions to me or anyone else at BBG regarding the use of the photographs.

38. Fugnetti never mentioned any restrictions to me or anyone else at BBG regarding the use of the photographs.

39. Fugnetti never mentioned to me or anyone else at BBG that he would retain ownership interest to the Flying Pigeon Image.

40. I said to him that I was going to use this Flying Pigeon Image, and Fugnetti agreed.

41. I told Fugnetti regarding BBG's intention to use the Flying Pigeon Image in BBG's future marketing materials.

42. Fugnetti never communicated to me or anyone at BBG regarding the restriction of the use of the Flying Pigeon Image to any specific display materials, spec sheets, and/or sales and educational materials.

I declare under penalty of perjury under the laws of the United States of America, the foregoing is true and correct. Executed on October 24, 2019, at Irvine, California.

*Stephanie Fitzpatrick*

Stephanie Fitzpatrick