Mathew K. Higbee, Esq. SBN 241380
Ryan E. Carreon, Esq., SBN 311668
**HIGBEE & ASSOCIATES**
1504 Brookhollow Dr., Suite 112
Santa Ana, CA 92705
(714) 617-8336
(714) 597-6559 facsimile
mhigbee@higbeeassociates.com
rcarreon@higbeeassociates.com

*Attorney for Plaintiff,*
DENNIS FUGNETTI PHOTOGRAPHY TRUST

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DENNIS FUGNETTI PHOTOGRAPHY TRUST,<br><br>                    Plaintiff,<br><br> v.<br><br>BIRD B GONE, LLC.; and DOES 1-10, inclusive,<br><br>                    Defendant. | Case No.: 8:19-cv-00847-SK<br><br>**DECLARATION OF RYAN E. CARREON IN SUPPORT OF MOTION TO EXCLUDE THE EXPERT TESTIMONY** |

1
**DECLARATION OF RYAN E. CARREON**

## <u>DECLARATION OF RYAN E. CARREON</u>

I, Ryan E. Carreon, declare as follows:

1.    I am an attorney at law duly authorized to practice in the state of California and the Central District.  I am over the age of 18 years old and I have personal knowledge of the matters stated herein. If called as a witness I could and would testify thereto.

2.    I am the attorney of record for Plaintiff Dennis Fugnetti Photography Trust ("Fugnetti") in this action.

3.    Attached hereto as Exhibit A are true and correct excerpts from the deposition of Peter Schwechheimer.

4.    Attached hereto as Exhibit B is the original Expert Damages Report of Peter Schwechheimer dated July 12, 2021.

5.    I have filed Exhibit B under seal in accordance with the pending Application for Leave to File Under Seal.

6.    Attached hereto as Exhibit C is the Supplemental Expert Damages Report of Peter Schwechheimer dated August 18, 2021.

7.    I have filed Exhibit C under seal in accordance with the pending Application for Leave to File Under Seal.

8.    On Friday July 30, 2021 the Parties held an informal discovery conference with Hon. Magistrate Judge Douglas F. McCormick.

9.    At the informal conference, Judge McCormick set a deadline for Fugnetti to provide a supplemental damages calculation for August 14, 2021 in light of additional information and documents that had come to light to the deposition of BBG's witnesses.

10.    On the evening of July 30, 2021, BBG provided a supplemental production of nearly 3,500 documents, almost double the amount of documents that it had previously produced in the litigation.

11.    After having reviewed the newly disclosed documents and additional

documents that were obtained via subpoena, Fugnetti prepared and served a supplemental damages disclosure on BBG, which included a detailed spreadsheet of products it had identified that used the Flying Pigeon Image on its packaging, the year the use occurred, citations to supporting evidence, and the gross revenues associated with the sales of those products.

I declare under penalty of perjury that the foregoing is true and correct under the laws of the United States of America.

Executed this August 17, 2022 at Wilmington, Delaware.

Ryan E. Carreon

# Exhibit "A"

# Deposition Transcript

Case Number: 8:19-cv-00847-CJC-DFM
Date: August 19, 2021

In the matter of:

# Dennis Fugnetti Photography Trust v Bird B Gone, Inc.

## Peter Schwechheimer

**CERTIFIED COPY**

Reported by:

Gretchen Lee Chatley



Steno
Official Reporters

1100 Glendon Ave.
Suite 1850
Los Angeles, CA 90024
concierge@steno.com
(310) 573-8380

1              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
2

3   DENNIS FUGNETTI PHOTOGRAPHY /Case: 8:19-cv-00847-CJC-DFM
    TRUST,                      /
4                               /
            Plaintiff,          /
5                               /
    v.                          /
6                               /
    BIRD B GONE, INC.; and      /
7   DOES 1-10, inclusive,       /
                                /
8           Defendant.          /
                               _/
9

10          DEPOSITION OF PETER SCHWECHHEIMER

11          Taken on Behalf of the Plaintiff.

12      DATE TAKEN:  August 19, 2021

13      TIME:        9:47 a.m. EST - 1:33 p.m. EST

14      PLACE:       Zoom Remote Technology Platform

15

16

17

18

19

20

21

22
          Examination of the witness taken before:
23
              GRETCHEN LEE CHATLEY, FPR
24                  STENO AGENCY
              CONCIERGE@STENO.COM
25                (310) 573-8380

```
 1          A P P E A R A N C E S

 2
     RYAN E. CARREON, Esquire
 3
     of Higbee & Associates
 4   1504 Brookhollow Drive, Suite 112
     Santa Ana, California  92705.
 5   rcarreon@higbeeassociates.com

 6   Attorney for the Plaintiff.

 7

     JOHN D. VAN LOBEN SELS, Esquire
 8   &
     ROBERT D. FISH, Esquire
 9
     of Fish IP Law
10   2603 Main Street, Suite 1000
     Irvine, California  92614.
11   jvanlobensels@fishiplaw.com

12   Attorney for the Defendant.

13

     ALSO PRESENT:
14
     SOYEUN CHOI, Esquire
15

16

17

18              – – –

19

20

21

22

23

24

25
```

1  file what we had at that point with the potential

2  of amending it once I had a little bit more time

3  to, you know, once I had a little bit more time to

4  think about the report, and to, um, you know, sort

5  of complete -- the process of putting these

6  together sometimes is very hectic, and especially

7  when you have court-appointed deadlines, so the

8  decision, I guess, was made to file what we had to

9  make sure that we met that deadline with the

10  possibility of amending it when I had a little bit

11  more time, so...

12       Q    And you mentioned that approximately a

13  week to prepare this; is that - am I recalling that

14  correctly?

15       A    Yes.  And not just preparing the report,

16  but the exhibits and doing all data research, the

17  third-party research.

18       Q    So let me just be clear.  You started

19  work on this a week prior to the deadline; am I

20  understanding that correctly?

21       A    I started work on this -- in earnest I'd

22  say I probably had one or two phone calls prior to

23  that, but I started in earnest after July 2nd.  I

24  was -- I was told at some point in late June that

25  the Plaintiff in this case would be, you know,

PETER SCHWECHHEIMER
AUGUST 19, 2021

JOB NO. 176867

 1   would be filing an expert report or disclosure on

 2   July 2nd.

 3          And given the size of the case and the

 4   expense that it takes to put together a report, you

 5   know, I didn't want to spend too much of the

 6   client's money without having seen -- because the

 7   Plaintiff bears the burden of proof in proving

 8   damages, and so my role on this was to provide a

 9   rebuttal opinion.

10          And so we waited.  I sort of held off

11   spending the client's money, and then it wasn't

12   until after July 2nd that we found out the

13   Plaintiff didn't file any type of damages

14   disclosure.  And so then the clock is tick -- so to

15   be honest, once I heard that the Plaintiff hadn't

16   filed an opinion, I was like, wow, I'm off the hook

17   to, you know, you still need a report; when would

18   you need it by and I was told it was the 12th.

19          And so then, you're in scramble mode, so

20   I would say that the vast majority of this was just

21   me trying to be judicious with my time assuming

22   that, you know, the Plaintiff would -- the

23   Plaintiff would have filed the report on July 2nd

24   and we would be responding to that.

25      Q    Okay.  And so just to circle back to the

1   "Summary of Opinion" section, so it was because you

2   were just rushing to meet that deadline that you

3   didn't -- you weren't able to complete this

4   section?

5          A    Yeah.   And I would -- I would

6   characterize this summary of opinions as just a --

7   as a helpful overview of what's in the remainder of

8   the report.  I could have just deleted that

9   particular section, and I don't think it would have

10  changed the report whatsoever.  It's more of a

11  convenience to say, hey, here are the four or five

12  points that I'm going to highlight for you that are

13  found in the remainder of the report.  I'm going to

14  summarize them for you here.

15          I don't think it's necessary, and, in

16  fact, I've had a number of experts, who have filed

17  reports that don't include such a summary.  So I

18  don't think it's, you know, it's ugly on the page,

19  and I wish I hadn't had -- I wish it wasn't like

20  that, but the opinion is still in there.  It's just

21  I didn't have a chance to put together a few bullet

22  points to summarize what that was.

23          Q    Okay.  Let's skip down -- excuse me --

24  let's skip down to Paragraph 11 on Page No. 3 and

25  let me know when you have that?

1       A     Yep, I do.

2       Q     Okay.  And let's look at the second

3  sentence.  It says, "My own search"; do you see

4  that?

5       A     Yes.

6       Q     Can you read that out loud, please?

7       A     "My own search of Mr. Fugnetti on of the

8  U.S. Copyright Office's Copyright Public Records

9  Portal revealed that between 1984 and 1991,

10  Mr. Fugnetti filed copyright registrations on 23

11  images of various high-end luxury automobiles

12  Including Corvette, Lamborghini, Ferrari, and

13  Porsche along with a single registration on

14  October 23, 2018, entitled 'Blackies' Pigeon #1'

15  (which I understand is the stock photograph image

16  at issue in this case.)"

17       Q     Thank you.  I'm going to send you another

18  exhibit and this is going to be a United States

19  Copyright Office Search Results, and we're going to

20  mark it as Exhibit 3.

21             (Plaintiff's Exhibit No. 3 is marked into

22       evidence.)

23  BY MR. CARREON:

24       Q     And just let me know when you have that

25  up and in front of you.

1      A    I do.

2      Q    Okay.  And in Paragraph 11 of the report

3  in Exhibit 2, you mention that you did your own

4  search and found a number of copyright

5  registrations and this Exhibit 3, does this look

6  like what the results of that search that you

7  referenced in Paragraph 11?

8      A    Yes.

9      Q    Okay.  So this is what you were referring

10 to when you were referring to the search results?

11     A    That's correct.

12     Q    Why did you conduct this search on the

13 Copyright Office website?

14     A    I was -- I was curious to -- there

15 wasn't -- so most of the documents, if not all the

16 documents up to that point in the case, were legal

17 pleadings, filings back and forth, which are

18 advocacy.

19          And so in trying to be more informed on

20 the case, I just did my own research as to who the

21 Plaintiff was, what his business was.  Because

22 there was a -- in the complaint, there was a

23 statement that he had done quite a bit of work for

24 -- and they named all this these big-name companies

25 that he had done work for.

PETER SCHWECHHEIMER                                          JOB NO. 176867
AUGUST 19, 2021

```
 1              And so just in general curiosity in
 2    preparation for, you know, to understand the
 3    parties in this case, I did this search because I
 4    wanted to see how, you know, how prolific of a
 5    photographer or photographic artist that he was.
 6    And so I performed this search and this is
 7    essentially the search that I got.
 8         Q    Okay.  And did the results of this search
 9    inform your opinion as contained in the report in
10    any way?
11         A    Well, I mean, I've made some observations
12    based on this.  I made some, you know, I made -- I
13    made at least one or two observations about --
14    about -- I made one or two observations about the
15    nature of, you know, some of the, you know, the
16    Plaintiff's copyright activity and whether or not
17    that has economic incantations.
18         Q    And can you point to a specific paragraph
19    in the report where you make these observations
20    that you're referring to?
21         A    In the report in front of you?
22         Q    Yes.
23         A    The report -- I don't know that if -- I
24    don't know that -- I'd have to read through the
25    report.  I don't know that it was necessarily -- I
```

1        So that's the first observation that I

2   had that, you know, when it came to the things that

3   he believed, you know, he was going to monetize, he

4   was -- he knew to register those copyrights.

5        And then, of course, with the pigeon

6   image, I still don't -- no one's been able to

7   explain the name to me there, but the pigeon image

8   was copyrighted as a result of the dispute in this

9   case, which is, you know, sometime after, you know.

10  I'm scanning this to look and see.

11       It looks like 1991 was the last time he

12  registered an image of an automobile.  And then

13  it's just curious that so far, you know, it's

14  nearly two decades later that he copyrighted, for

15  this matter, that he copyrighted the flying pigeon

16  image, so...

17    Q    And so those observations that you just

18  articulated how did those inform your expert

19  opinion if at all?

20    A    Well, what I would say to that is this;

21  to me, it goes to what he believed were the

22  opportunities to monetize that image, what he

23  believed, you know, what he believed were the

24  monetization opportunities of that image.  So I

25  understand generally that he was under sort of a

1    work-for-hire.  He took a number of photographs of

2    pigeons back in 1999.  So I understand this

3    generally that he didn't register those copyrights,

4    but he knew enough to register copyrights of, you

5    know, of his sort of passion project of these

6    high-end automobiles because he was -- he had some

7    business plan or he was selling -- to sell these

8    images on his -- on tee-shirts and things, and he

9    wanted to register those in case someone had copied

10   them, but he hadn't copyrighted -- he didn't apply

11   for the registration for the pigeon image.

12           The Defendant in this case, has made the

13   claim that, you know, this was a work-for-hire, and

14   the fact that he didn't register that copyright,

15   you know, informs me that he didn't really have any

16   plans to monetize that because he had been

17   compensated for that previously, or that he was --

18   could have monetized that in any way with anyone

19   else, and it's a stock photograph of a pigeon.

20           So not registering it means, you know,

21   inform, it doesn't mean, it informs the value as to

22   what he thought was the, you know, the economic

23   opportunity of owning that copyright.

24      Q    And so just so I'm clear, your opinion on

25   what the economic value of that copyright of the

PETER SCHWECHHEIMER
AUGUST 19, 2021

JOB NO. 176867

1   flying bird image would be is based in part on this

2   understanding that you have of Mr. Fugnetti's

3   sophistication because, according to your research,

4   he was able to -- or knew enough to register all of

5   these other images previously?

6       A     Yeah.  If I -- if I had a -- if I'm Annie

7   Leibovitz, right, and I take a picture of famous

8   people and they're valuable, and people are going

9   to pay me a lot of money for those, I copyright

10  that because in doing so, I can protect my right to

11  prevent others from using it and suing them if they

12  do.

13          When you don't, you still own the -- I

14  understand you still own the copyright once you

15  take the photograph unless you're that baboon that

16  lost his case when he took a selfie, but you get to

17  -- you own the copyright, but you don't get to

18  enforce that copyright unless you've registered it.

19          And so if you don't register the

20  copyright, it doesn't mean you don't own it, it

21  just means that either you're unsophisticated and

22  you don't know what that means, and clearly, he

23  knew enough or he was smart enough counsel to know

24  that he should have registered his other

25  copyrights.  And so not registering it informs me

1   whether the bird's got his wings flapping or

2   whether it's standing there in, you know, Trafalgar

3   Square.  It's really about what's in the box, but

4   it's not really what's on the box.

5           And I think -- I say this in the report

6   that I filed yesterday, the fact that they've taken

7   the bird image off the products, and that these are

8   products are commercially successful, are -- gets

9   to that point about what is it worth, and whether

10  or not an alternative, any one of those hundreds of

11  thousands of bird images would be a good

12  alternative because if you take the bird image off

13  the box, it's still -- people -- customers are

14  buying it for what's in the box.

15          So customers appear to be indifferent

16  between a bird or no bird, so they have to be

17  really even less, you know, concerning when it

18  comes to this bird or that bird, so that's my

19  point.

20      Q    So you mentioned earlier you're not a

21  photography expert, correct, and you weren't hired

22  to render any type of photography opinion in this

23  case?

24      A    No.  I don't know what a photography

25  expert is, but I'm not one I don't think based on

1    your question.

2         Q    Okay.  And are you -- do you have any

3    expertise in marketing or advertising?

4         A    No.  No, but I certainly understand the

5    economic -- as an economist, I understand the

6    economic consequences of marketing and advertising

7    as they impact consumer demand and prices and

8    things like that, so I wouldn't hold myself out as

9    -- I'm not the market expert, but marketing isn't

10   done a vacuum.  There are economic consequences to

11   that that I feel comfortable commenting on.

12        Q    But you are not an expert on what would

13   constitute effective marketing or advertising,

14   correct?

15        A    No.  No, but I, again, it's not done in a

16   vacuum, and I could render an opinion based on

17   objective data that resulted from that to tell you

18   whether or not a marketing campaign was effective

19   or not.

20        Q    And that would be based on an economic

21   analysis, correct?

22        A    Sure.  Sure, but there's often quite a

23   bit of overlap here.  I mean, these things aren't

24   -- there's often not a bright line between -- sure,

25   it would be an economic opinion, but, you know, to

```
 1  work, it just required better organization.
 2       Q    Okay.  And so you didn't review any
 3  additional documents or information in preparing
 4  this amended report that you hadn't already
 5  reviewed in preparing the initial report?
 6       A    Yeah.  The amended report came so quickly
 7  after the -- I think it was the next day, frankly,
 8  that I don't think I -- there was no new
 9  information that was provided to me by counsel in
10  that amount of time, so everything I would have
11  been at my disposal.  I don't think I reviewed
12  anything new.
13       Q    So would it be fair to say that this
14  amended report is more, for lack of a better term,
15  a polish of the original report rather than
16  something that is completely new or different?
17       A    I would -- that general characterization
18  is fair.
19       Q    Could you just describe in general terms
20  what differences there are between the amended
21  report and the original report in Exhibit 1?
22       A    I included that snazzy economic chart
23  there in Section 15.  I thought that was a good way
24  to show the effects of price in the market.  There
25  was some line in it.  I included the summary of
```

1  the Defendant's burden of proof.  And as a damages

2  expert, I'm just trying to pin down what your

3  opinion is and trying to comment on the economic

4  rationale for that opinion.

5          And as of this date, it appears, through

6  the pleadings of the Plaintiff, that they don't

7  have a concrete opinion as to what the damages are.

8  And so I -- I leave open the alternative for me to

9  be able to comment on -- like, so there's no

10  damages report.  There's a disclosure.

11         The disclosure in some points are vague,

12  and, in fact, some points there have been mistakes,

13  and so I just leave open the possibility of being

14  able to comment on the Plaintiff's opinion if and

15  when that opinion is finalized.  And it doesn't

16  appear as of the date of even this report, which

17  was yesterday, that the Plaintiff knows exactly

18  what it is asking for.

19      Q    All right.  Let's skip down to Paragraph

20  29, and we're gonna go to I believe the second

21  sentence about halfway down and it says "As

22  discussed below" and when you have that, just let

23  me know.

24      A    Okay.  I'm here.

25      Q    All right.  Can you read that sentence,

PETER SCHWECHHEIMER
AUGUST 19, 2021

JOB NO. 176867

1   please?

2       A    "As discussed below, Fugnetti's damages

3   "computation" is irreparably flawed in that it

4   fails to establish any causal connection between

5   the alleged infringement of its copyrighted image

6   and the alleged incremental economic benefit that

7   is required to both demonstrate its actual damages,

8   and/or benefit to BBG, and establish a basis

9   allowing the trier of fact to set an appropriate

10  statutory recovery."

11      Q    What is your basis for asserting that

12  there is no causal connection between the

13  infringement and the incremental economic benefit?

14      A    So, again, I don't want to step over the

15  line and give a legal opinion, so I'll tell you

16  that this is -- I'm telling you this is the

17  economic consequences of the statute.  But as an

18  economist, the application of the -- so there's

19  harm to the -- there's actual damage, which is

20  actual damage to the Plaintiff, or there's the

21  benefit derived by the Defendant.

22          What I'm saying here is when it's your

23  opinion that you take the total amount of sales

24  that included a bird image without correctly --

25  because it says -- because the statute says your

1    burden is to prove sales and it's the Defendant's

2    burden to prove its costs.  When you rely on that

3    statute and the way an economist views this is,

4    under copyright, damages are generally -- the

5    profits are disgorged under copyright because the

6    copyrighted work is really like the article of

7    sale, the article of manufacturer.

8              So if I take a copy of Frankenstein by

9    Mary Shelley, which is not copyrighted any more,

10   but assume that it is, and or I sell that or I take

11   excerpts of that and sell that, I'm actually --

12   that's the work for hire.  That's where the

13   economic value resides.  The copyright is the book

14   and I'm selling that or I'm selling music.

15             I'm using or sampling someone's music

16   without paying for it.  The fact that the value of

17   that work, in its entirety, the entire value is

18   derived from that work, and so disgorging the

19   profits.  If I just take your book and I sell it

20   and I make the profit, the Plaintiff should be

21   entitled because the entire value was wrapped up in

22   that work.

23             What I'm saying here is when the value of

24   what the manufacture -- the article of manufacture

25   is the sale, is a bird deterrent system in that the

PETER SCHWECHHEIMER                                    JOB NO. 176867
AUGUST 19, 2021

1    copyright is a photograph of a bird that's put on a
2    box.  It's not really the basis of demand for the
3    product.  The basis of the demand for the product
4    is a customer who doesn't want the pigeons on their
5    roof anymore.
6              The burden is incidental to that sale, so
7    disgorging all of the profit off of the product
8    itself in which the copyright is only incidental to
9    that.  That's what I'm getting at here that you
10   haven't determined the incremental economic value
11   of that particular bird image on the sale of a
12   product in which the demand for that product is
13   derived, not from the bird, but from the value of
14   the product itself, and disgorging all of the
15   profits I believe from an economic perspective
16   without apportioning that value is the wrong way to
17   go.
18        Q    What specific date or information are you
19   basing that opinion on?
20        A    Well, they sell -- I understand that at
21   various points in time, Bird B Gone used the
22   copyrighted image we're discussing today and that
23   there are times on its product packaging, and there
24   were sometimes that it didn't.  The fact that the
25   product itself or the products themselves that do

1    not include the image are commercially successful

2    without the image implies to an economist that the

3    incremental value of having the image on the box is

4    de minimis because the customer is really

5    purchasing the product.

6            It's not purchasing -- if they were

7    selling copies of -- if Bird B Gone were selling

8    tee-shirts with the bird image on it, that's

9    different than selling a product in which the

10   burden is a, you know, is an incidental part of the

11   product packaging.

12           And so I observe that there are sales,

13   commercial sales of the product that don't include

14   that image, and they are -- customers are still

15   buying the product with or without the image.  So

16   the image isn't the source of demand for the

17   product.  That product is the demand.

18           Getting rid of birds with the spikes is

19   what -- is where the demand for the product comes

20   from; it's not the pigeon image.

21      Q    So let me ask you this question:  You

22   mentioned sales of products with the flying pigeon

23   image versus sale of products without the flying

24   pigeon image.  When you're referring to sale of

25   products without the flying pigeon image, are you

PETER SCHWECHHEIMER
AUGUST 19, 2021

JOB NO. 176867

1    referring to products that have no imagery on the

2    box, or are you referring to products that have a

3    substitute flying bird photo on the box?

4         A    Well, I haven't seen -- so I got sales

5    records from Bird B Gone that form the basis of

6    Fugnetti 01063, which is a summary of the products

7    by skew and the amount of revenues in the total,

8    which had a couple of errors in it, but we all make

9    mistakes, right?

10            So the underlying document that the

11   Plaintiff relied upon to come up with that estimate

12   was a document of various skews and sales from 2005

13   to 2020 or '21, and only some of those skews that

14   have been identified by the Plaintiff included the

15   bird image.

16            So I got down to the ones that was

17   accused in Fugnetti 01063.  When you get down to

18   that level, there are -- and I read Mr. Donoho's

19   deposition that it's still commercially successful,

20   that sales went up, and that they've taken the bird

21   image off the box.  I don't know if they included

22   another bird image, but I know that that particular

23   bird image sometimes is on the product packaging

24   and sometimes is not.

25            And I noticed that when it's not on

PETER SCHWECHHEIMER                                      JOB NO. 176867
AUGUST 19, 2021

1  there, it's not that sales go to zero.  It's that

2  people still want the bird spikes, what's in the

3  box, and not what's --they're buying what's in the

4  box and not what's on the box.

5       Q    And can you tell me what specific years

6  and what specific products you're referring to in

7  your analysis?

8       A    Well, let's establish this.  This is

9  Plaintiff's analysis; it's not my analysis.

10       Q    But you're referring to -- you're

11  referring to years when it wasn't used on the box,

12  so I'm trying to understand what products that

13  you're looking at and what years that you're

14  looking at, and that you have determined that the

15  bird, in fact, was not used on the product box that

16  year?

17       A    And, again, I'm going off of what the

18  Plaintiff identified.  So the Plaintiff identifies

19  in Fugnetti 01063, the skew by year.  It identified

20  in some years, it identifies that, you know,

21  without as an exhibit in front of me, I'm going off

22  my memory, so I don't want to make a mistake here.

23            But there are some years -- so I know Mr.

24  Donoho says it's no longer on the packaging and

25  they're still selling the product, so we know that,

PETER SCHWECHHEIMER                                          JOB NO. 176867
AUGUST 19, 2021

1    right, based on his deposition testimony.   And he

2    also -- his deposition testimony said that the

3    sales have gone up.

4                Now, that's not causation it's

5    correlation, but they didn't go to zero, okay?   I

6    only know from Plaintiff's disclosure that for some

7    skews in some years, they identified that they

8    believed the pigeon image was on the box, and for

9    other years that it wasn't, and so that's the

10   basis.   It's not my analysis.   It's my critique of

11   Plaintiff's analysis.

12        Q    Well, so and I guess I just want to be

13   clear because in Fugnetti 01063, which is a

14   spreadsheet identifying products, years of use,

15   supporting evidence, gross sales, and then the

16   coordinates on the sales sheet where the gross

17   sales number was derived.

18                I am not aware of any product on the

19   spreadsheet Fugnetti 01063 that says that a product

20   was not, in a specific year, did not have the bird

21   image on it?

22        A    Well, it doesn't say it specifically, but

23   there are years in which the combination of the

24   year in the skew isn't included in your list.

25        Q    Okay.   But that -- so your assumption is

1  that if it's not on the list that that means

2  certainly that the bird image wasn't used on that

3  skew in that year?

4      A    I'm saying if it wasn't on your list, you

5  don't believe that it was on the packaging in that

6  year or you would have included it.  I know from

7  Mr. Donoho that there were years in which they

8  didn't use it and that the years that they did, and

9  his deposition testimony says that they no longer

10  use it, so...

11      Q    But you would agree, though, that there's

12  a difference between saying we can't identify

13  either way whether it's used versus it definitively

14  wasn't used?

15      A    Again, that's your burden.  You prepare

16  that spreadsheet and I looked at it, so there

17  wasn't any indication to me you made that

18  distinction.

19      Q    But it sounds to me, though, that you're

20  basing your expert opinion on the fact that if it

21  was not included in the spreadsheet that that means

22  that the bird image wasn't used that year

23  definitively; am I incorrect in that understanding?

24      A    Well, I think you are incorrect.  What

25  I'm basing my opinion on is the fact that testimony

PETER SCHWECHHEIMER
AUGUST 19, 2021

JOB NO. 176867

1   from Mr. Donoho that said we didn't always use the

2   image.  Some years we did, and some years we

3   didn't, and for some products we did, and for some

4   products, we didn't.  But as of 2018, I believe was

5   his testimony, as of this lawsuit certainly, that

6   they no longer use that image, and they haven't

7   gone out of business in the bird spike business,

8   you know what I mean.

9         But I can't, you know, I analyzed that

10  spreadsheet that was sent to me.  I don't know what

11  was in the Plaintiff's head when they included

12  that, you know, when they made those calculations.

13  I can only observe objectively what they included

14  and what they didn't.  And I find it curious that

15  there was, you know, say 2015, they identified it

16  on the box and 2017 they identified it on, but in

17  2016 they didn't.

18        Now, it may have been on the box, but I

19  don't know that, and it's not my analysis.  It's

20  yours, and I'm limited by what your ability to both

21  tell me and explain what you've done.  So this

22  shouldn't be a criticism of me.  I'm criticizing

23  the Plaintiff's opinion here.

24        So it's not my burden, but I can only go

25  with the objective facts that are in front of me,

1  and I know Mr. Donoho testified that it's no longer

2  on the box, but I also notice that it's not accused

3  in some other years.

4  　　　　　Again, this goes back to 2005, and

5  there's a paucity of information, and, tragically,

6  the Plaintiff is no longer here to provide

7  testimony on this, and we're going back

8  20-something years for documents in people's

9  memories.  That's a long time.  I was a young man

10  20 years ago, right?  It's a long time ago.

11  　　　　　I can only -- it's your burden to prove

12  damages.  It's your burden to state your case.  I'm

13  just trying to objectively understand what it was

14  and it appears that there were some years in which

15  you accuse the product and some years that you

16  don't, and I can't read your mind as to what the

17  basis of that is.

18  　　Q　　Sure.  And so I just want to be clear,

19  I'm not asking you about Plaintiff's analysis.

20  What I'm trying to understand is what observations

21  or assumptions that you're making when you review

22  the damages spreadsheet and how that informs your

23  expert opinion.  And it sounded to me --

24  　　　　　MS. CHOI:  -- (unintelligible) --

25  　　　　　MR. CARREON:  I'm sorry?

PETER SCHWECHHEIMER                                                    JOB NO. 176867
AUGUST 19, 2021

```
 1              MS. CHOI:  Go ahead.
 2   BY MR. CARREON:
 3        Q    It sounded to me that one basis of
 4   forming your opinion as to the propriety of seeking
 5   profits is that there are certain years for which
 6   Plaintiff did not include a gross sales figure on
 7   the spreadsheet and that your assumption was that
 8   that meant that Bird B Gone did not use that bird
 9   image on the product in that particular year; is
10   that correct?
11        A    No, I don't think that's right.  If
12   we're -- if we're -- it was sort of -- it is
13   curious that in some years, you know, say as an
14   example, 2015, it's accused that the revenues in
15   2017 there are, but there aren't in 2016.  My
16   honest assumption was that the way-back machine
17   didn't include the information that would have
18   allowed you to put that cell in there.
19              So I don't know -- I can't imagine that
20   in 2015, they use the image on the box, and in
21   2017, they do, but 2016, they didn't.  Now, they
22   may have.  I don't know that.  I'm not reading that
23   into it.  But let take a step back here for a
24   second about my opinion really is the
25   appropriateness of whether or not the Plaintiff is
```

PETER SCHWECHHEIMER                          JOB NO. 176867
AUGUST 19, 2021

1   entitled to disgorge all the profits of a product
2   that is commercially successful with or without the
3   bird photo, and whose, you know, demand is derived,
4   not from the photograph on the box, but the
5   deterrent system, the product that's actually being
6   sold.
7           What the wisdom is of disgorging, and,
8   again, as I say in my report from yesterday, it is
9   a financial windfall, which is inappropriate to
10  reward the Plaintiff simply because the statute
11  says, you know, you can disgorge profits because it
12  doesn't really consider what if the copyrighted
13  worth isn't the basis of the demand for the
14  product.  That's really what -- that's really my
15  opinion.
16          We can get into is it based on 2016, we
17  couldn't prove or you proved it, or whatever,
18  that's your analysis.  I'm critiquing that.  But
19  taking a step back, I don't believe it's
20  appropriate to disgorge the profits of the entire
21  value of the product based on the fact that you
22  included a generic picture of a pigeon on the box.
23     Q    Were you asked to render an opinion on
24  whether there's any percentage of the profits that
25  are appropriately disgorged?

1        A     It's not my burden here; that's your

2    burden.   If you had --

3        Q     So my question -- my question was:   Were

4    you asked to render an opinion as to whether

5    there's any percentage of profits that are

6    appropriate to be disgorged?

7        A     Was I asked to -- I was asked to

8    calculate damages in this case is I was asked for

9    an opinion on.   Counsel didn't tell me how they

10   wanted the opinion, how much of the opinion, they

11   just said we need an opinion.   And based on my

12   experience, I provided them one.

13            If there was more information, there's

14   not a lot of data and information here, and

15   people's memories seem to be fading, but if there

16   was more information, you know, I could do -- I

17   spent my entire career trying to apportion the

18   value of intellectual property from among the

19   thousands of other patents and copyrights that go

20   into complex devices, so this is something that

21   gets me up in the morning for work.

22            There's not enough information, at this

23   point, for me to affirmatively do that; however,

24   I'm informed by the fact that you can buy the

25   license exclusive rights to bird images for a

 1   couple of hundred dollars for unlimited use.  That
 2   informed my valuation of the incremental value of
 3   the pigeon here.  And it's not between the pigeon
 4   and another pigeon, it's the pigeon and no pigeon.
 5   It doesn't seem to matter.
 6          So but the burden is on -- this is your
 7   damages claim.  I'm here to provide a critique of
 8   on -- I'm here to assist this trier of fact in a
 9   better understanding of what that claim is, and as
10   of yet, I don't know what your complete claim is.
11      Q    Sure.  So I'm not asking you what the
12   legal burdens of proof are.  I'm asking you what
13   you were or were not retained to render an opinion
14   on so that I can understand.  So were you retained
15   to render an opinion as to what percentage, if any,
16   of Bird B Gone profits are attributable to the
17   infringement?
18          MR. VAN LOBEN SELS:  Objection; asked and
19      answered.
20          THE WITNESS:  As part of my retention, I
21      was well prepared given available information
22      to be able to render that opinion.  There
23      aren't enough facts in this case at this point
24      for me to do so specifically, except for the
25      fact that I can get an unlimited number of

1    comparable bird images for a few hundred

2    dollars.

3         And so in doing that, I could take the

4    volume of sales, given the de minimis amount

5    of damages in this case, and I didn't want to

6    boil the ocean to come up with this, but given

7    the fact that there's only a couple of hundred

8    dollars' worth of value in any particular

9    generic bird image, I could, in fact, come up

10   with some estimate of that, but was in my

11   toolbox, and there isn't enough -- again, I'm

12   not the Plaintiff here.

13        It's not my burden to show this.  I was

14   asked to render a damages opinion.  That is an

15   opinion I could render and would gladly render

16   if I had more information or felt it was

17   important for the trier of fact to put that

18   into that context.  But I think given the fact

19   that the bird photographs are $200 to $500

20   speak for themselves in terms of the

21   percentage of the value of the total sale.

22        All you need to do is take the value of

23   the bird image and divide it by the total

24   amount of sales or estimate the total amount

25   of sales in the future that if used the bird

1        C E R T I F I C A T E   O F   R E P O R T E R

2    STATE OF FLORIDA)

3    COUNTY OF ST. JOHNS)

4        I, Gretchen Lee Chatley, Florida Professional

5    Reporter and Notary Public in and for the State of

6    Florida at Large, do hereby certify that I was

7    authorized to and did stenographically report the

8    deposition of PETER SCHWECHHEIMER; that a review of

9    the transcript was requested; and that the

10   transcript is a true and correct record of my

11   stenographic notes.

12        I further certify that I am not a relative,

13   employee, attorney, or counsel of any of the

14   parties, nor am I a relative or employee of any of

15   the parties' attorney or counsel connected with the

16   action, nor am I financially interested in the

17   action.

18

19              DATED this 19th day of August 2021.

20                          *Gretchen L. Chatley*

21                   /s/  Gretchen Lee Chatley
                     GRETCHEN LEE CHATLEY, FPR
22

23

24

25

1              C E R T I F I C A T E   O F   O A T H

2    STATE OF FLORIDA)

3    COUNTY OF DUVAL)

4              I, the undersigned authority, certify

5    that PETER SCHWECHHEIMER personally appeared before

6    me and was duly sworn.

7              WITNESS my hand and official seal this

8    19th day of August 2021.

9

10

11

12

13          /s/ Gretchen Lee Chatley
            GRETCHEN LEE CHATLEY, FPR
14          NOTARY PUBLIC – STATE OF FLORIDA
            COMMISSION NO. FF 075572
15          EXPIRES:  FEBRUARY 18, 2022

16

17

18

19

20

21

22

23

24                    *  *  *

25

# Exhibit "B"

*Highly Confidential*
*Outside Attorneys' Eyes Only*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Dennis Fugnetti,<br><br>                    Plaintiff,<br><br>v.<br><br>Bird-B-Gone, Inc.; and Does 1-10, inclusive,<br><br>                    Defendant. | Case No. 8:19-cv-00847-AG (DFMx) |
| Bird-B-Gone, Inc.; and Does 1-10, inclusive,<br><br>          Counter-Claim Plaintiff,<br><br>v.<br><br>Dennis Fugnetti, an individual,<br><br>          Counter-Claim Defendant. | |

## EXPERT DAMAGES REPORT OF PETER SCHWECHHEIMER

_____

Peter Schwechheimer                    July 12, 2021

*Highly Confidential*
*Outside Attorneys' Eyes Only*

## TABLE OF CONTENTS

I.   SCOPE OF ASSIGNMENT ............................................................................... 1

II.  QUALIFICATIONS AND EXPERIENCE ...................................................... 1

III. SUMMARY OF OPINIONS ............................................................................ 2

IV.  BACKGROUND OF THE PARTIES AND RELEVANT TIMELINE OF EVENTS .... 2

   A.   Fugnetti ....................................................................................................... 2

   B.   Bird-B-Gone ............................................................................................... 3

V.   THE MARKET FOR STOCK PHOTOGRAPHS ......................................... 3

   A.   Stock Photograph Industry ......................................................................... 3

   B.   Rights-Managed (RM) and Royalty-Free (RF) Pricing Models ................... 4

   C.   The Economic Value of Generic Stock Photographs ................................... 5

VI.  ANALYSIS OF FUGNETTI'S ALLEGED COPYRIGHT DAMAGES ......... 6

   A.   Remedies for Copyright Infringement ......................................................... 6

   B.   Fugnetti's Alleged Copyright Damages ....................................................... 7

*Highly Confidential*
*Outside Attorneys' Eyes Only*

## I.   SCOPE OF ASSIGNMENT

1.   I have been retained by counsel at Fish IP Law, LLP ("Fish") on behalf of Defendant and Counter-Claim Plaintiff Bird-B-Gone, Inc. ("BBG") to assess the amount of economic damages owed to Plaintiff and Counter-Claim Defendant Dennis Fugnetti, an individual, ("Fugnetti") in the event the trier-of-fact determines BBG has infringed a certain copyrighted photograph owned and registered to Fugnetti. I understand BBG has asserted counterclaims alleging Fugnetti breached both his oral contract and his oral non-exclusive license with BBG[1]

2.   I have been informed that copyright plaintiff Fugnetti was scheduled to make certain expert disclosures identifying the nature and scope of its alleged copyright damages on or before July 2, 2021. I understand that as of the date of my report, counsel for Fugnetti has not yet provided or otherwise disclosed its position regarding Fugnetti's alleged copyright damagesw. I would respectfully request the opportunity to supplement and/or amend my opinions herein should additional information or testimony become available after the filing of this report.

3.   During the course of my work on this matter, I have considered documents and information produced in discovery including, *inter alia*, certain email correspondences between Fugnetti and BBG, Fugnetti and Fish, various case pleadings including, *inter alia*, the Complaint for Damages and Injunctive Relief (ECF1) and Defendant's First Amended Answer and Counterclaims (ECF32) as well as publicly available data, documents, and other information relevant to evaluating the issues in this case. In addition to sources cited throughout this report and accompanying exhibits, Exhibit 2 lists the documents that I received or considered in forming my opinions in this matter.

## II.   QUALIFICATIONS AND EXPERIENCE

4.   I am an economic consultant and testifying expert with twenty-five years' experience on intellectual property, antitrust, patent licensing, technology standards, and commercial litigation matters. My expertise focuses on the analysis and calculation of economic damages in the form of lost profits / price erosion, reasonable royalties, unjust enrichment, and lost

---

[1] Defendant's First Amended Answer and Counterclaims dated October 1, 2019 (ECF32).

*Highly Confidential*
*Outside Attorneys' Eyes Only*

enterprise value on a broad range of cases including patent, copyright, and trade dress infringement, trade secret misappropriation, antitrust, and breach of contract disputes. Additionally, my experience and expertise includes the assessment of fair, reasonable, and non-discriminatory (FRAND) royalties with respect to the licensing of standard essential patents (SEPs).

5.   In addition, I am an adjunct professor of economics at Bentley University in Waltham, Massachusetts where teach courses focusing on applied economics and intellectual property strategy.

6.   My curriculum vitae, which details my professional experience including matters I've testified in or consulted on is appended to this report as Exhibit 1. I am being compensated at a rate of $675 per hour for my work on this matter. My compensation is neither contingent on the opinions expressed in my report nor on the outcome of this litigation.

## III.   SUMMARY OF OPINIONS

7.   Xx

8.   Xx

9.

## IV.   BACKGROUND OF THE PARTIES AND RELEVANT TIMELINE OF EVENTS

### A.  Fugnetti

10.   I understand that Plaintiff Dennis Fugnetti was a commercial photographer in southern California for forty years and that and his daughter own and operate a retail merchandise website that sells photographic prints, books, and apparel (including t-shirts, outerwear, and baby clothes) based on Mr. Fugnatti's automotive photographs and artwork.[2]

---

[2] https://shopfugnettiimages.com/pages/about-us. I understand that Katie Fugnetti, in her capacity as trustee of the Dennis Fugnetti Photography Trust, has become the substitute Plaintiff and Counter-Defendant upon the unfortunate and untimely passing of Dennis Fugnetti in January 2020.

*Highly Confidential*
*Outside Attorneys' Eyes Only*

11.    Fugnetti is the owner of the at-issue stock photographic image of a pigeon landing, hereafter referred to as the "Flying Pigeon Image". My own search of Mr. Fugnetti on of the U.S. Copyright Office's *Copyright Public Records Portal* revealed that between 1984 and 1991, Mr. Fugnetti filed copyright registrations on 23 images of various high end luxury automobiles including Corvette, Lamborghini, Ferrari, and Porsche along with a single registration on October 23, 2018 titled "Blackies Pigeon #1" (which I understand is the stock photograph image at issue in this case.)[3]

### B.  Bird-B-Gone

12.    Defendant Bird-B-Gone ("BBG") markets itself as the "world's largest manufacturer of professional grade bird deterrents" and is the owner of several copyrights, trademarks, and is the assignee on more than 50 U.S. patents on its bird deterrent devices.[4]

## V.    THE MARKET FOR STOCK PHOTOGRAPHS

### A.  Stock Photograph Industry

13.    Stock photography involves the licensing of rights to photographs for a fee. Historically, the principal method of licensing stock images for editorial, advertising, and general commercial use was based on the volume of usage with factors such as image size, placement (e.g., cover or inside of media), product circulation, term or duration of use, and geographic scope (e.g.,

---

[3]   See https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?Search_Arg=Fugnetti&Search_Code=NALL&PID=5vk4zkIDBG9jednLGBoeaUuaBENMu&SEQ=20210712175358&CNT=25&HIST=1
[4]   Defendant's First Amended Answer and Counterclaims dated October 1, 2019 (ECF32). *See also* https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?Search_Arg=Bird+B+Gone&Search_Code=NALL&PID=_h-msXWCiUHt5DihVs11Wt8Bj9RcdqSV&SEQ=20210712174249&CNT=100&HIST=1;

https://tmsearch.uspto.gov/bin/showfield?f=toc&state=4804%3Azxgrqm.1.1&p_search=searchss&p_L=50&BackReference=&p_plural=yes&p_s_PARA1=&p_tagrepl%7E%3A=PARA1%24LD&expr=PARA1+AND+PARA2&p_s_PARA2=Bird+B+Gone&p_tagrepl%7E%3A=PARA2%24COMB&p_op_ALL=AND&a_default=search&a_search=Submit+Query&a_search=Submit+Query; and,

https://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO2&Sect2=HITOFF&p=1&u=%2Fnetahtml%2FPTO%2Fsearch-bool.html&r=0&f=S&l=50&TERM1=Bird+B+Gone&FIELD1=ASNM&co1=AND&TERM2=&FIELD2=&d=PTXT.

*Highly Confidential*
*Outside Attorneys' Eyes Only*

country or region) each factoring into a particular image's usage fee.[5] This industry-wide pricing standard would later come to be known as the Rights Managed (RM) licensing model.[6]

14.   Beginning in the early 1990s, the introduction and rapidly increasing commercial significance of the Internet coupled with significant technological advances in digital camera and imaging capabilities caused a fundamental shift in the way images were created (by whom) and marketed that would radically alter the stock photography industry.[7] In contrast to traditional stock photography agencies such as competitors Getty Images and Alamy, so-called "microstock" agencies a) source their stock images exclusively via the Internet, b) accept images from a much wider range of photographers including semiprofessionals, amateurs, and hobbyists, and c) traditionally sell their images at very low rates under a royalty-free (RF) pricing model.

15.   Where traditional photographic stock companies charged a per-image fee in the hundreds or even thousands of dollars, prices charged by so-called "microstock" companies "can be as low as 25 cents, and payments to photographers are even lower, often not much more than pennies per sale."[8] In Exhibit 3, I provide a list of stock photograph agencies by agency type (i.e., macrostock or microstock), identifying each company's licensing model as well as the total number of available stock photographs in their image catalogs.

### B.  Rights-Managed (RM) and Royalty-Free (RF) Pricing Models

16.   The Royalty-Free licensing model allows a customer the ability to use an image in an unlimited number of ways for a single fixed price license fee. Unlike under a Rights-Managed model, once the customer has licensed an image, that customer may use that image as often as desired without paying additional licensing fees. A royalty-free license fee is set on the size of the resolution and the artistic value of the digital file. Royalty-free usage rights are generally non-exclusive and many other customers may simultaneously use the same image. Royalty-free

---

[5] https://www.selling-stock.com/Article/history-of-the-stock-photo-industry-0.
[6] https://www.selling-stock.com/Article/history-of-the-stock-photo-industry-0.
[7] xxCite
[8] https://www.nytimes.com/2007/06/05/technology/circuits/05syndicate.html

*Highly Confidential*
*Outside Attorneys' Eyes Only*

images can be sold on a standalone basis, as part of a collection of images, or on a subscription basis.[9]

17.     Under a Rights-Managed licensing model, the license fee is based on the intended use or application of the image, geographic scope, license term or duration, circulation and level of exclusivity. Rights-managed images are licensed on a use-by-use basis and were traditionally considered to represent the highest quality of images in an agency's collection. In 2019 Getty Images announced that it would be phasing out it's Rights-Managed model in 2020 in favor of a royalty-free model for its creative image collection. In the announcement, Getty stated "over the years, customers' needs have changed," and 'confidently concluded that the [rights-managed] creative image licensing model no longer meets our [buyers] needs'.[10]

### C.  The Economic Value of Generic Stock Photographs

18.     It is standard economics textbook fare that price of a particular good or service is constrained by the availability of commercially acceptable alternatives. Beginning in the 1990s, lower barriers to entry fueled by rapid technological innovation significantly increased in the supply of stock photographic images (i.e., commercially acceptable alternatives to traditional, more exclusive stock images) and with it the entire industry-wide pricing model.

19.     As shown in Exhibit 4, the current market rate for access to non-exclusive, royalty-free images ranges from a (size dependent) price of $50.00 (one-time fixed payment) to a $365.00 one-time fixed payment for unlimited use.

20.     In Exhibit 5, I provide data on the total availability of images depicting pigeons flying across the major macrostock and microstock agencies in which more than 175,000 separate photos of approximately 193,000 such photos are available for purchase on a non-exclusive royalty free basis.

---

[9] https://www.sec.gov/Archives/edgar/data/1047202/000119312507134473/d10k.htm, https://www.selling-stock.com/Article/history-of-the-stock-photo-industry-0
[10] https://www.sec.gov/Archives/edgar/data/1047202/000119312507134473/d10k.htm; https://www.selling-stock.com/Article/history-of-the-stock-photo-industry-0; https://www.dpreview.com/news/0475276807/getty-is-phasing-out-rights-managed-photos-in-favor-of-royalty-free-content; https://petapixel.com/2019/11/07/getty-is-going-all-royalty-free-and-that-sucks-for-photographers/

*Highly Confidential*
*Outside Attorneys' Eyes Only*

21.    Table 1 below depicts the microstock agency Dreamstime's suggest list price for the <u>exclusive</u> <u>rights</u> to any of its stock images (with the number of downloads representing the incremental popularity or demand for the particular image.)

**Table 1. Dreamstime's Recommended Exclusive SR-EL Price[11]**

| Number of Previous Image Purchases (Downloads) | Recommended Image Price |
|:---:|:---:|
| 0 | $250 |
| 1 | $300 |
| 2 | $400 |
| 3 | $500 |
| 4 | $600 |
| 5 | $700 |
| 6-25 | $800 |
| 26-50 | $1,000 |
| 51-100 | $2,000 |
| 101-200 | $2,500 |
| 201-300 | $3,000 |
| 301-400 | $3,500 |
| 401-500 | $4,000 |
| >500 | $5,000 |

## VI.    ANALYSIS OF FUGNETTI'S ALLEGED COPYRIGHT DAMAGES

### A.  Remedies for Copyright Infringement

22.    U.S. copyright law defines "[a]nyone who violates any of the exclusive rights of the copyright owner . . . author . . . or imports copies or phonorecords into the United States" (in violation of

---

[11] https://www.dreamstime.com/srprices.php.

*Highly Confidential*
*Outside Attorneys' Eyes Only*

the statute) as an "infringer of the copyright or right of the author."[12] In addition, I understand that "an infringer of a copyright is liable for either 1) the copyright owners actual damages and any additional profits of the infringer <u>or</u> 2) statutory damages."[13]

23.     Under the statute, a copyright owner is entitled to recover the actual damages it suffered as a result of the infringement in addition to any profits of the infringer that are attributable to the infringement but that are not take into account in computing the copyright owner's actual damages.[14] In the alternative, the copyright owner may elect an award of statutory damages for all infringements involved in the action "in a sum of not less than $750 or more than $30,000 as the court considers just."[15] I understand that the court has the discretion to either increase the award of statutory damages (to $150,000 if it is determined the copyright infringement was committed willfully) or reduce the award of statutory damages (so a sum not less than $200 if the court deems that the infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright.)[16]

24.     Finally, I understand that a recent Second Circuit decision found, among other things, that monetary damages in a copyright infringement suit are limited to those incurred in the three years preceding the commencement of suit.[17]

25.     As mentioned in the opening section of my report, I am unaware of plaintiff's position with respect to its alleged damages in this case but would respectfully request the ability to respond to any disclosure of its alleged economic harm.

### B.  Fugnetti's Alleged Copyright Damages

26.     I understand that BBG sought to purchase the rights to the Flying Pigeon Image (including the copyright) for $5,200 and that Fugnetti was allegedly willing to grant BBG a limited license for use of his (now) copyrighted image for the same dollar figure.  If the trier of fact determines

---

[12] *See* 17 U.S. Code § 501 at https://www.law.cornell.edu/uscode/text/17/501.

[13] *See* 17 U.S. Code § 504 at https://www.law.cornell.edu/uscode/text/17/504.

[14] *See* 17 U.S. Code § 504(b). I understand that in establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenues. The copyright infringer is therefore required to prove relevant expenses and any other element of its profits not attributable to and resulting from infringement of the copyrighted work.

[15] *See* 17 U.S. Code § 504(c)(1)

[16] *See* 17 U.S. Code § 504(c)(2)

[17] https://www.jdsupra.com/legalnews/second-circuit-limits-copyright-damages-87680/

*Highly Confidential*
*Outside Attorneys' Eyes Only*

that BBG is liable for copyright infringement, I would direct them to the current set of single image prices for stock photographs as well as the availability of nearly 200,000 images of flying pigeons as a benchmark for BBG's copyright damages and as reasonableness test for the $5,200 license figure negotiated but not consummated between the plaintiff and defendant.

# Exhibit "C"

*Highly Confidential*
*Outside Attorneys' Eyes Only*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

Dennis Fugnetti Photography Trust,

              Plaintiff,

v.

Bird B Gone, Inc.; and Does 1-10, inclusive,

              Defendant.

Case No. 8:19-cv-00847-CJC (DFMx)

## SUPPLEMENTAL EXPERT DAMAGES REPORT OF PETER SCHWECHHEIMER

Peter Schwechheimer            August 18, 2021

*Highly Confidential*
*Outside Attorneys' Eyes Only*

## TABLE OF CONTENTS

I.    SCOPE OF ASSIGNMENT ........................................................................... 1

II.   QUALIFICATIONS AND EXPERIENCE ................................................... 1

III.  SUMMARY OF OPINIONS ...................................................................... 2

IV.  BACKGROUND OF THE PARTIES AND RELEVANT TIMELINE OF EVENTS .... 3

    A.   Fugnetti ............................................................................................ 3

    B.   Bird B Gone ...................................................................................... 3

V.    THE MARKET FOR STOCK PHOTOGRAPHIC IMAGES ...................... 4

    A.   Stock Photograph Industry ............................................................... 4

    B.   Rights-Managed (RM) and Royalty-Free (RF) Pricing Models ..................... 5

    C.   The Economic Value of Generic Stock Photographs ................................ 6

VI.  ANALYSIS OF FUGNETTI'S ALLEGED COPYRIGHT DAMAGES ......... 7

    A.   Remedies for Copyright Infringement .................................................. 7

    B.   Timeline of Relevant Events .............................................................. 9

    C.   Fugnetti's Alleged Copyright Damages ................................................ 9

VII. RESPONSE TO FUGNETTI'S "COMPUTATION OF DAMAGES" ......... 10

    A.   Fugnetti's alleged "actual" damages .................................................. 11

    B.   Statutory damages .......................................................................... 12

*Highly Confidential*
*Outside Attorneys' Eyes Only*

## I.    SCOPE OF ASSIGNMENT

1.    I previously disclosed certain expert opinions regarding the reasonable amount of economic damages that would be owed to copyright plaintiff Dennis Fugnetti Photography Trust ("Fugnetti") in the event the trier-of-fact were to determine defendant Bird B Gone ("BBG") infringed the copyrighted image registered to and asserted by Fugnetti in this case.[1] As I noted in my prior report, plaintiff Fugnetti had yet to provide any information with respect to the nature and scope of its alleged copyright damages as of July 13, 2021.

2.    I understand that on August 13, 2021, Fugnetti provided certain supplemental disclosures and responses outline the purported statutory and actual damages it may seek for BBG's alleged copyright infringement.[2] As such, I have been asked by counsel at Fish IP Law, LLP ("Fish") to review and respond, where appropriate, as to the appropriateness and reliability of the damages claims recently proffered on behalf of plaintiff Fugnetti.

3.    During the course of my work on this matter, I have considered documents and information produced in discovery including, *inter alia*, certain email correspondences between Fugnetti and BBG and between Fugnetti and Fish, various case pleadings including, *inter alia*, the Complaint for Damages and Injunctive Relief (ECF1) and Defendant's First Amended Answer and Counterclaims (ECF32), certain deposition testimony of BBG employees and consultants, as well as publicly available data, documents, and other information relevant to evaluating the issues in this case.

## II.    QUALIFICATIONS AND EXPERIENCE

4.    I am an economic consultant and testifying expert with twenty-five years' experience on intellectual property, antitrust, patent licensing, technology standards, and commercial litigation matters. My expertise focuses on the analysis and calculation of economic damages in the form of lost profits / price erosion, reasonable royalties, unjust enrichment, and lost

---

[1] Amended Expert Damages Report of Peter Schwechheimer dated July 13, 2021. I understand BBG has asserted counterclaims against Fugnetti alleging both breach of (oral) contract and breach of (oral) license agreement (*See:* Complaint for Damages and Injunctive Relief, Copyright Infringement, dated May 6, 2019 (ECF1); Defendant's First Amended Answer and Counterclaims dated October 1, 2019 (ECF32).)

[2] Plaintiff Dennis Fugnetti Photography Trust's Second Supplement Disclosures, pp. 3-5; Second Supplemental Responses to Interrogatory No. 6, pp. 5-7.

*Highly Confidential*
*Outside Attorneys' Eyes Only*

enterprise value on a broad range of cases including patent, copyright, and trade dress infringement, trade secret misappropriation, antitrust, and breach of contract disputes. Additionally, my experience and expertise include the assessment of fair, reasonable, and non-discriminatory (FRAND) royalties with respect to the licensing of standard essential patents (SEPs).

5.   In addition, I am an adjunct professor of economics at Bentley University in Waltham, Massachusetts where I teach courses focusing on applied economics, microeconomics, and intellectual property strategy.

6.   My curriculum vitae, which details my professional experience including matters I've testified in or consulted on is appended to this report as Exhibit 1. I am being compensated at a rate of $675 per hour for my work on this matter. My compensation is neither contingent on the opinions expressed in my report nor on the outcome of this litigation.

### III.   SUMMARY OF OPINIONS

7.   Coupled with the advance of the Internet as a commercially viable distribution network, a technology-driven shift in the market for professional stock image photography has significantly altered the economics of in the industry-wide pricing model.

8.   A significant increase in the quantity and quality of stock photographic images supplied by semi-professional, amateur, and hobbyist photographers over the past two-plus decades has significantly reduced the price and value of stock images from observed prices that prevailed in the market as of the mid- to late-1990s.

9.   Given the existence and availability of several thousand comparable (e.g., "isolated") flying pigeon photographic images that can be licensed for unlimited commercial use (both on an exclusive and non-exclusive basis) at prices in the low hundreds of dollars (Exhibit 3), the value of a license to Fugnetti's Flying Pigeon Image, and therefore its total copyright damages claim against BBG, would be correspondingly priced (i.e., low hundreds of dollars) and in any event no more than a one-time payment of $5,200 offered by BBG.

10.  While it is the case that an infringer of a copyright is liable for either a) the copyright owner's actual damages or b) statutory damages, Fugnetti's recently disclosed "Computation of

*Highly Confidential*
*Outside Attorneys' Eyes Only*

Damages" wholly fails to establish a causal economic relationship between the alleged infringement and Fugnetti's "actual" damages, estimates certain damages over an impermissible timeframe, includes mathematical errors, and provides no reasonable basis that would allow the trier-of-fact to benchmark a reasonable statutory damages award.

## IV.   BACKGROUND OF THE PARTIES AND RELEVANT TIMELINE OF EVENTS

### A.  Fugnetti

11.   I understand that Plaintiff Dennis Fugnetti was a commercial photographer in southern California for forty years and that he and his daughter own and operate a retail merchandise website that sells photographic prints, books, and apparel (including t-shirts, outerwear, and baby clothes) based on Mr. Fugnetti's automotive photographs and artwork.[3]

12.   Fugnetti represented himself as the owner of the at-issue stock photographic image of a pigeon landing, hereafter referred to as the "Flying Pigeon Image". My own search of Mr. Fugnetti on the U.S. Copyright Office's *Copyright Public Records Portal* revealed that between 1984 and 1991, Mr. Fugnetti filed copyright registrations on 23 images of various high end luxury automobiles including Corvette, Lamborghini, Ferrari, and Porsche along with a single registration on October 23, 2018 titled "Blackies Pigeon #1" (which I understand is the stock photograph image at issue in this case.)[4]

### B.  Bird B Gone

13.   Defendant Bird B Gone ("BBG") markets itself as the "world's largest manufacturer of professional grade bird deterrents" and is the owner of several copyrights, trademarks, and is the assignee on more than 50 U.S. patents on its bird deterrent devices.[5]

---

[3] https://shopfugnettiimages.com/pages/about-us. I understand that Katie Fugnetti, in her capacity as trustee of the Dennis Fugnetti Photography Trust, has become the substitute Plaintiff and Counter-Defendant upon the unfortunate and untimely passing of Dennis Fugnetti in January 2020.

[4] See https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?Search_Arg=Fugnetti&Search_Code=NALL&PID=5vk4zkIDBG9jednLGBoeaUuaBENMu&SEQ=20210712175358&CNT=25&HIST=1

[5] Defendant's First Amended Answer and Counterclaims dated October 1, 2019 (ECF32). *See also* https://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?Search_Arg=Bird+B+Gone&Search_Code=NALL&PID=_h-msXWCiUHt5DihVs11Wt8Bj9RcdqSV&SEQ=20210712174249&CNT=100&HIST=1;

*Highly Confidential*
*Outside Attorneys' Eyes Only*

## V.    THE MARKET FOR STOCK PHOTOGRAPHIC IMAGES

### A.  Stock Photograph Industry

14.    Stock photography involves the licensing of rights to photographs for a fee. Historically, the principal method of licensing stock images for editorial, advertising, and general commercial use was based on the volume of usage with factors such as image size, placement (e.g., cover or inside of media), product circulation, term or duration of use, and geographic scope (e.g., country or region) each factoring into a particular image's usage fee.[6] This industry-wide pricing standard would later come to be known as the Rights Managed (RM) licensing model.[7]

15.    Beginning in the early 1990s, the introduction and rapidly increasing commercial significance of the Internet coupled with significant technological advances in digital camera and imaging capabilities caused a paradigm shift in the way images were created and marketed that would radically alter the stock photography industry.[8] In contrast to traditional stock photography agencies such as competitors Getty Images and Alamy, the birth of these so-called "microstock" agencies a) source their stock images exclusively via the Internet, b) accept images from a much wider range of photographers including semiprofessionals, amateurs, and hobbyists, and c) traditionally sell their images at very low rates under a royalty-free (RF) pricing model.

16.    Where traditional photographic stock companies such as Getty Images and its predecessors operated under a pricing model in which it was often able to charge per-image fees in the hundreds or even thousands of dollars, prices charged by so-called "microstock" companies "can be as low as 25 cents, and payments to photographers are even lower, often not much

---

https://tmsearch.uspto.gov/bin/showfield?f=toc&state=4804%3Azxgrqm.1.1&p_search=searchss&p_L=50&BackReference=&p_plural=yes&p_s_PARA1=&p_tagrepl%7E%3A=PARA1%24LD&expr=PARA1+AND+PARA2&p_s_PARA2=Bird+B+Gone&p_tagrepl%7E%3A=PARA2%24COMB&p_op_ALL=AND&a_default=search&a_search=Submit+Query&a_search=Submit+Query; and,

https://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO2&Sect2=HITOFF&p=1&u=%2Fnetahtml%2FPTO%2Fsearch-bool.html&r=0&f=S&l=50&TERM1=Bird+B+Gone&FIELD1=ASNM&co1=AND&TERM2=&FIELD2=&d=PTXT.

[6] https://www.selling-stock.com/Article/history-of-the-stock-photo-industry-0.
[7] https://www.selling-stock.com/Article/history-of-the-stock-photo-industry-0.
[8] https://www.selling-stock.com/Article/history-of-the-stock-photo-industry-0.

*Highly Confidential*
*Outside Attorneys' Eyes Only*

more than pennies per sale."[9] In Exhibit 2, I provide a list of stock photograph agencies by agency type (i.e., macrostock or microstock), identifying each company's licensing model as well as the total number of available stock photographs in their image catalogs. The combined effect on the stock photograph market resulting from technological advance and the increased commercial sophistication of the Internet as a distribution network is graphically depicted Graph 1 (below); an increase in the supply of a product (e.g., stock images), all else equal, causes a reduction in the price of that product from the equilibrium price = p* to the new, lower price $p_2$.



**B. Rights-Managed (RM) and Royalty-Free (RF) Pricing Models**

17.    The Royalty-Free licensing model allows a customer the ability to use an image in an unlimited number of ways for a single fixed price license fee. Unlike under a Rights-Managed model, once the customer has licensed an image, that customer may use that image as often as desired without paying additional licensing fees. A royalty-free license fee is set on the size of the resolution and the artistic value of the digital file. Royalty-free usage rights are generally non-

---

[9] https://www.nytimes.com/2007/06/05/technology/circuits/05syndicate.html.

*Highly Confidential*
*Outside Attorneys' Eyes Only*

exclusive and many other customers may simultaneously use the same image. Royalty-free images can be sold on a standalone basis, as part of a collection of images, or on a subscription basis.[10]

18.    Under a Rights-Managed licensing model, the license fee is based on the intended use or application of the image, geographic scope, license term or duration, circulation and level of exclusivity. Rights-managed images are licensed on a use-by-use basis and were traditionally considered to represent the highest quality of images in an agency's collection. In 2019 Getty Images announced that it would be phasing out its Rights-Managed model in 2020 in favor of a royalty-free model for its creative image collection. In the announcement, Getty stated "over the years, customers' needs have changed," and "confidently concluded that the [rights-managed] creative image licensing model no longer meets our [buyers] needs."[11]

### C.  The Economic Value of Generic Stock Photographs

19.    It is one of the principles of economics that the price of a particular good or service is constrained by, among other things, the availability close substitutes. As discussed previously in my report, lower barriers to technology innovation led to a significant increase in the supply and availability of stock photographic images (i.e., commercially acceptable alternatives to traditional, more exclusive stock images) disrupted the industry-wide pricing model that had been traditionally been based on low supply (fewer professional photographers) and higher image prices into a high volume, low price commodity business in less than a decade.

20.    As summarized  in Exhibit 3, the current market rate for access to non-exclusive, royalty-free images ranges from a price of $50.00 (one-time fixed payment) to a $365.00 one-time fixed payment for unlimited use (depending on the size of the image.) In addition, Exhibit 4 summarizes data I retrieved based on my search of "flying pigeons" images available at across the major macrostock and microstock agencies.[12] The total number of images depicting flying

---

[10] https://www.sec.gov/Archives/edgar/data/1047202/000119312507134473/d10k.htm, https://www.selling-stock.com/Article/history-of-the-stock-photo-industry-0
[11] https://www.sec.gov/Archives/edgar/data/1047202/000119312507134473/d10k.htm; https://www.selling-stock.com/Article/history-of-the-stock-photo-industry-0; https://www.dpreview.com/news/0475276807/getty-is-phasing-out-rights-managed-photos-in-favor-of-royalty-free-content; https://petapixel.com/2019/11/07/getty-is-going-all-royalty-free-and-that-sucks-for-photographers/
[12] Exhibit 4.

*Highly Confidential*
*Outside Attorneys' Eyes Only*

pigeons that are available to license under both Rights-Managed and Royalty-Free terms is in the tens to hundreds of thousands of images.

21.   In response to Fugnetti's offer of an exclusive license right to the Flying Pigeon Image, I provide data on suggested prices for the exclusive license of stock images. Table 1 below depicts the microstock agency Dreamstime's suggest list price for the <u>exclusive rights</u> to any of its stock images (with the number of downloads representing the incremental popularity or demand for the particular image.) That is, images in greater demand (i.e., greater number of downloads) have a higher recommended price for their exclusivity.

**Table 1. Dreamstime's Recommended Exclusive SR-EL Price[13]**

| Number of Previous Image Purchases (Downloads) | Recommended Image Price |
|:---:|:---:|
| 0 | $250 |
| 1 | $300 |
| 2 | $400 |
| 3 | $500 |
| 4 | $600 |
| 5 | $700 |
| 6-25 | $800 |
| 26-50 | $1,000 |
| 51-100 | $2,000 |
| 101-200 | $2,500 |
| 201-300 | $3,000 |
| 301-400 | $3,500 |
| 401-500 | $4,000 |
| >500 | $5,000 |

## VI.   ANALYSIS OF FUGNETTI'S ALLEGED COPYRIGHT DAMAGES

### A.  Remedies for Copyright Infringement

22.   U.S. copyright law defines "[a]nyone who violates any of the exclusive rights of the copyright owner . . . author . . . or imports copies or phonorecords into the United States" (in violation of

---

[13] https://www.dreamstime.com/srprices.php.

*Highly Confidential*
*Outside Attorneys' Eyes Only*

the statute) as an "infringer of the copyright or right of the author."[14] In addition, I understand that "an infringer of a copyright is liable for either 1) the copyright owner's actual damages and any additional profits of the infringer <u>or</u> 2) statutory damages."[15]

23.    Under the statute, a copyright owner is entitled to recover the actual damages it suffered as a result of the infringement in addition to any profits of the infringer that are attributable to the infringement but that are not take into account in computing the copyright owner's actual damages.[16] In the alternative, the copyright owner may elect an award of statutory damages for all infringements involved in the action "in a sum of not less than $750 or more than $30,000 as the court considers just."[17] I understand that the court has the discretion to either increase the award of statutory damages (to $150,000 if it is determined the copyright infringement was committed willfully) or reduce the award of statutory damages (so a sum not less than $200 if the court deems that the infringer was not aware and had no reason to believe that his or her acts constituted an infringement of copyright.)[18]

24.    Finally, I understand that a recent Second Circuit decision found, among other things, that monetary damages in a copyright infringement suit are limited to those incurred in the three years preceding the commencement of suit.[19]

25.    As mentioned in the opening section of my report, I am unaware of plaintiff's position with respect to its alleged damages in this case but would respectfully request the ability to respond to any disclosure of its alleged economic harm.

---

[14] *See* 17 U.S. Code § 501 at https://www.law.cornell.edu/uscode/text/17/501.

[15] *See* 17 U.S. Code § 504 at https://www.law.cornell.edu/uscode/text/17/504.

[16] *See* 17 U.S. Code § 504(b). I understand that in establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenues. The copyright infringer is therefore required to prove relevant expenses and any other element of its profits not attributable to and resulting from infringement of the copyrighted work.

[17] *See* 17 U.S. Code § 504(c)(1)

[18] *See* 17 U.S. Code § 504(c)(2)

[19] https://www.jdsupra.com/legalnews/second-circuit-limits-copyright-damages-87680/

*Highly Confidential*
*Outside Attorneys' Eyes Only*

### B. Timeline of Relevant Events

26.   Based on my review of the case pleadings and certain emails among and between BBG, Fugnetti, and counsel for the Plaintiff and Defendant, I provide the following general timeline of events relevant to my analysis of Fugnetti's alleged copyright damages.

   a.   In or about 1999 (or the late 1990s) BBG engaged MIAD as an independent contractor to produce certain graphic design materials including possibly display and sales materials, spec sheets, and/or marketing advertisements for BBG products.[20]

   b.   At some point in the 2002 – 2003 timeframe, BBG decided to service its graphic design/marketing materials internally and no longer hired Fugnetti as an independent contractor for this work.[21]

   c.   Over the May – August 2017 timeframe, BBG and Fugnetti began an exchange of emails regarding the regarding the approximate dates of the photographs taken in conjunction with his work for BBG (including the Flying Pigeon Image) approximately 20 years earlier.[22]

   d.   This exchange between BBG and Fugnetti culminated in Fugnetti offering BBG a "life time exclusive rights to my image" for a "fee" totaling $5,200 for the "Limited use of Flying Pigeon copyright for print and web".[23]

   e.   On August 27, 2018, counsel for BBG responded to Fugnetti with a counteroffer requesting BBG acquire "full ownership of copyrights of the image" for the $5,200 license fee first proposed by Fugnetti.

### C. Fugnetti's Alleged Copyright Damages

27.   I understand that BBG sought to purchase the rights to the Flying Pigeon Image (including the copyright) for $5,200 and that Fugnetti was allegedly willing to grant BBG a limited license

---

[20] Complaint for Damages and Injunctive Relief, Copyright Infringement, dated May 6, 2019 (ECF1); Defendant's First Amended Answer and Counterclaims dated October 1, 2019 (ECF32).
[21] Complaint for Damages and Injunctive Relief, Copyright Infringement, dated May 6, 2019 (ECF1); Defendant's First Amended Answer and Counterclaims dated October 1, 2019 (ECF32).
[22] Complaint for Damages and Injunctive Relief, Copyright Infringement, dated May 6, 2019 (ECF1), Exhibit C.
[23] FUGNETTI00017-00026 at 17-18.

*Highly Confidential*
*Outside Attorneys' Eyes Only*

for use of his (now) copyrighted image for the same dollar figure.  If the trier of fact determines that BBG is liable for copyright infringement, I would direct them to the current set of single image prices for stock photographs as well as the availability of (literally) tens of thousands of comparable images of flying pigeons as a benchmark for Fugnetti's copyright damages (and as reasonableness test for the $5,200 license figure negotiated but not consummated between the plaintiff and defendant.)

28.    It is demonstrably true that the incremental economic value of stock photographs today is significantly below what they had been a generation ago (a phenomenon that exists across several industries based on high technology inputs.) As such, it is my professional opinion, based on my extensive research and acquisition and analysis of relevant stock photograph pricing data, Fugnetti's total copyright damages are, at most, $5,200 (based on an average market price, based on the low-cost availability of comparable images, of approximately $250 - $500.)

## VII.    RESPONSE TO FUGNETTI'S "COMPUTATION OF DAMAGES"

29.    I understand that fully one moth following service of my amended expert damages report, plaintiff Fugnetti served supplemental disclosures and responses purporting to provide a "computation of damages" of Fugnetti's alleged statutory and actual damages resulting from BBG's alleged infringing use of the Flying Pigeon Image.  As discussed below, Fugnetti's damages "computation" is irreparably flawed in that it fails to establish any causal connection between the alleged infringement of its copyrighted image and the allleged incremental economic benefit that is required to both demonstrate its actual damages (and/or benefit to BBG) and establish a basis allowing the trier-of-fact set an appropriate statutory recovery.

30.    It is important to note that Fugnetti's damages responses admittedly do not provide a complete and accurate disclosure of Fugnetti's damages claim against BBG.  As such, I respectfully reiterate my request to further supplement the opinions expressed in my expert reports to address any forthcoming damages-related disclosures, responses, or opinions proffered by Fugnetti.

*Highly Confidential*
*Outside Attorneys' Eyes Only*

### A.  Fugnetti's alleged "actual" damages

31.   As a threshold matter, Fugnetti's disclosures are based exclusively on the alleged "gain" received by BBG from the alleged infringing use of the Flying Pigeon Image and not from any specific "loss" suffered by Fugnetti. Fugnetti / MIAD were contracted by BBG in 1999 for work involving the at-issue pigeon image for which plaintiff was paid accordingly.[24] I am not aware of any efforts by plaintiff to additionally monetize its (now) copyrighted pigeon photograph through the sale of prints or pigeon-themed merchandise, or through additional licensing opportunities, or through the sale of its property rights in the at-issue photograph that were scuttled by BBG's alleged infringing use. The "actual" damages sought by Fugnetti here are those "additional" profits of the infringer that are recoverable under the statute.[25] From an economic perspective, the disgorgement of BBG's profits allowed under the relevant statute would perhaps be applicable here if it were the case that BBG was selling photographic prints of the Flying Pigeon Image (i.e., where the copyrighted work formed the commercial basis or demand for the alleged infringing sale.) However, given that the alleged infringement of the copyrighted pigeon photograph is merely incidental to the sale of and demand for BBG's pigeon deterrent products (e.g., bird "spikes"), Fugnetti's "actual" damages here must necessarily reflect the incremental economic benefit (i.e., profits) that the use of Flying Pigeon Image provides to the sale of BBG's pigeon deterrent products. I observe that the ongoing commercial success of BBG's bird spike products in packaging that now does not include the at-issue copyrighted photograph indicates the incremental value of the Flying Pigeon Image is effectively zero. Therefore, a disgorgement of BBG's profits on the product revenues identified by Fugnetti over the 2015 – 2019 timeframe would unjustifiably punish BBG for use rights to the Flying Pigeon Image it had already paid for while gifting a financial windfall totaling millions of dollars to Fugnetti (at BBG's expense) based on litigation risk alone and not on the underlying economic value of Fugnetti's copyrighted image. Based on its recent disclosures, Fugnetti seeks "actual" damages more than $3.1 million in certain BBG product revenues.[26]

---

[24] Fugnetti was paid $1,278.88 by BBG in conjunction with the Flying Pigeon Image, an amount that included his photographic and "retouch" work along with certain expenses including film and travel. *See:* BBG00560-561.

[25] *See* 17 U.S. Code § 504 at https://www.law.cornell.edu/uscode/text/17/504.

[26] Fugnetti10163. I note Fugnetti has made two calculation errors in its spreadsheet: 1) its summation of BBG's gross sales (Column D) inadvertently excludes $172,031.51 in gross sales for product SKU MMRTH for 2015 (cell D2) and 2) SKU "MM2001-5-6 – 6 ft. Stainless Spike" includes no entry for $24,052.69 in 2019 (*See:* BBG_00693.) I

*Highly Confidential*
*Outside Attorneys' Eyes Only*

32. Fugnetti has also indicated that it intends "to rely upon the invoice for a non-exclusive . . . use of the Flying Pigeon Image for $5,200 [] multiplied by the 16 years in which Bird B Gone used the Flying Pigeon Image without authorization (2003 to 2019) for a total lost licensing fee of $83,000."[27] However, this claim by Fugnetti is a nonsensical amalgam of cherry-picked data points and misrepresentations constructed to achieve the largest possible damages claim and it should be dismissed as such.  The $5,200 figure cited by plaintiff here represents the  offer for the one-time, perpetual assignment of ownership rights to the Flying Pigeon Image copyright to BBG and not plaintiff's (now) assertion that this amount somehow reflects the annual payment required of BBG for the non-exclusive use rights to an image for which it had previously purchased.[28] In addition, I understand from counsel that plaintiff's alleged damages here are limited to (at most) three years prior to 2018 registration of the Flying Pigeon Image copyright by Fugnetti, further indicating that Fugnetti's (now) "lost licensing fee" claim is merely an unsupported, opportunistic exercise in mathematics and not a principled economic analysis.

### B.  Statutory damages

Finally, while it may be that the "Court has complete discretion to choose the amount of the statutory award so long as it is within the permissible statutory range" and that "there need not be any correlation between statutory damages and actual damages" (emphasis added) (because plaintiff may not have suffered actual damages resulting from the asserted copyright infringement), one would reasonably expect that the trier-of-fact would necessarily base such an award on the relevant economic facts of the particular case including the nature of the allegedly infringing use of the copyrighted image and the incremental economic benefit of that use to the alleged infringer and the copyright owner and not merely on a whim.[29]  Here, the overwhelming evidence indicates that BBG's alleged infringing use of the copyrighted work

---

understand from BBG's management that the gross profit margin on its bird products is 25% - 32% of sales and that company-wide net profits range between 5% - 10% on an annual basis.

[27] Plaintiff Dennis Fugnetti Photography Trust's Second Supplement Disclosures, p. 4.

[28] BBG_01587-589 at 588. I have seen no contemporaneous information on record in this case that supports Fugnetti's legal position regarding an annual royalty payment. Even Mr. Fugnetti's contemporaneous proposal to license the Flying Pigeon Image for $5,200 (with no ownership rights) did not contemplate this to be an annual license fee.

[29] Plaintiff Dennis Fugnetti Photography Trust's Second Supplement Disclosures, pp. 3-4 citing *Curtis v. Illumination Arts, Inc.*, 33 F. Supp. 3d 1200, 1220 (W.D. Wash. 2014) citing *F.W. Woolworth Co. v. Contemporary Arts, Inc.,* 344 U.S. 228, 232 (1952).

*Highly Confidential*
*Outside Attorneys' Eyes Only*

that it had commissioned and paid for in full decades earlier provided little, if any, incremental value to the sale of BBG's bird deterrent products and it would be wholly opportunistic to suggest otherwise; especially given the sheer volume of comparable pigeon images available in the market at prices in the $250 - $500 range for unlimited commercial use of the particular image.

# Peter Schwechheimer

(e) pschwech@citypointeconomics.com

(m) 617.921.4248

9 M Street

Boston, MA 02127

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| City Point Economics, LLC | 2018 – present |
| Bentley University | 2020 – present |
| | |
| Charles River Associates, Inc. | 1997 – 2015 |
| Analysis Group, Inc. | 2016 – 2018 |

Peter Schwechheimer is a consulting and testifying expert with more than two decades of experience in the areas of intellectual property, antitrust, commercial litigation, licensing and valuation, and transfer pricing matters. Peter's expertise includes the evaluation and calculation of economic damages including lost profits, profit disgorgement, price erosion, reasonable royalties, unjust enrichment, and lost enterprise value on a range of matters involving patent, copyright, and trademark infringement, trade secret misappropriation, attempted monopoly/monopsony, group boycott, price fixing, and breach of contract claims in both the U.S. and Canada. In addition, Peter's expertise includes technology licensing, patent valuation, and the assessment of fair, reasonable, and nondiscriminatory (F/RAND) royalties for standard essential patents (SEPs).

Peter has testified in deposition and at trial in federal court, state court, and in arbitration.

His professional experience covers a broad range of industries and product categories in high technology, medical devices, consumer products, industrial products, and pharmaceuticals including computer software and hardware, platform technologies, video game consoles, LCD panels, smartphones, wireless communication technology, telecommunications equipment, video surveillance appliances, manufacturing processes, surgical equipment, aortic stents, allografts, dietary supplements, and small molecule drugs.

Peter is an adjunct professor of economics at Bentley University where he teaches applied economics and intellectual property strategy.

## EDUCATION

| | |
|---|---|
| Massachusetts Institute of Technology, Sloan School of Management | MBA |
| Bentley University | B.S., Economics |

## SPEAKING ENGAGEMENTS, PRESENTATIONS, AND OTHER PROJECTS

Peter has been a faculty member at the Practising Law Institute (PLI), a leading non-profit learning organization providing continuing legal and professional education programs, where he regularly presents on advanced topics and methodologies in assessing patent infringement damages.

In addition, he has also been an invited speaker on IP litigation, strategy, and damages at Boston University's Questrom School of Management and has presented on the current landscape and future trends in patent and trade secret damages at several national law firms.

Peter's pro bono projects have included work on behalf of the Southern Poverty Law Center (SPLC)

# Peter Schwechheimer

(e) pschwech@citypointeconomics.com

(m) 617.921.4248

9 M Street
Boston, MA 02127

## EXPERT MATTERS AND SELECT CONSULTING ENGAGEMENTS

### *Expert reports and testimony*

Patent Infringement.

- *Nokia Technologies Oy v. Lenovo Group, Ltd. & Anr.*
  In the High Court of Delhi, New Delhi, C.S. (COMM) No. 581 of 2019
  Analysis of SEP licensing negotiations, patent hold-up and FRAND royalty commitments, and irreparable harm/injunctions with respect to H.264/AVC technology

- *Flow Pharma, Inc. v. Bausch Health Companies Inc. et al.*
  Northern District of California; Case No. 18-CV-05769
  Reasonable royalty damages resulting from the alleged infringement of a patented antibiotic used in orthopedic surgery.

- *IMS Health Incorporated v. Symphony Health Solutions*
  District of Delaware; Case No. 13-cv-02071
  Lost profit and reasonable royalty damages from alleged infringement of patient data anonymization and deduplication algorithm technology.

- *Hewlett-Packard Company v. ServiceNow, Inc.*
  Northern District of California; Case No. 14-cv-00570
  Lost profits, price erosion, and reasonable royalty damages resulting from alleged infringement of network server technology in IT service management (SaaS) software.

- *Bandspeed, Inc. v. Garmin International, Inc., et al.*
  Western District of Texas; Case No. 11-cv-00771
  On behalf of Toshiba, rebuttal of the plaintiff's reasonable royalty, FRAND, and antitrust damages claims on adaptive frequency hopping (AFH) technology disclosed to the Bluetooth standard.

- *Enpat, Inc. v. Tenrox, Inc.*
  Middle District of Florida; Case No. 13-cv-00948
  Rebuttal of a patent assertion entity's reasonable royalty damages calculation based on the alleged infringement of automated project management software.

- *SFP Works, LLC v. Buffalo Armory LLC*
  Eastern District of Michigan; Case No. 14-cv-13575
  Reasonable royalty damages resulting from the defendant's alleged infringement of patented technology for micro-treating iron-based alloys.

- *CoorsTek, Inc. v. Steven F. Reiber and Mary L. Reiber*
  District of Colorado; Case No. 08-cv-01133
  On behalf of declaratory judgment plaintiff, lost profit and reasonable royalty damages from alleged infringement of patented ceramic capillary technology.

- *Avidyne Corporation v. L3 Communications Avionics Systems, Inc.*
  District of Massachusetts; Case No. 05-cv-11098
  On behalf of declaratory judgment plaintiff, rebuttal of lost profit, price erosion, and reasonable royalty damages on alleged infringement of flight instrument attitude indicator calibration technology.

Trade Secret Misappropriation

- *DynaColor, Inc. v. Razberi Technologies, Inc. and Netvideo Consulting, Inc.*
  American Arbitration Association; Case No. 01-16-0003-3734
  Lost profit damages and unjust enrichment from alleged trade secret misappropriation and breach of contract with respect to surveillance network video recorder (NVR) technology.

- *Altaire Pharmaceuticals, Inc. v. Paragon BioTeck, Inc.*
  Eastern District of New York; Case No. 15-cv-02416
  Calculated plaintiff's actual damages and defendant's and unjust enrichment resulting from the alleged misappropriation and disclosure of the plaintiff's confidential formulation in FDA approved phenylephrine ophthalmic eye drops.

- *AMAX Information Technologies, Inc. v. Triet Pham and Hyve Solutions*
  California Superior Court, Alameda County; Case No. HG-15764134
  Unjust enrichment and lost profit damages from the allege misappropriation of trade secrets regarding data center and server-to-rack OEM platform integration designs and associated marketing documents.

- *Copper Harbor Company, Inc. v. Central Garden & Pet Company, et al.*
  California Superior Court, Contra Costa County; Case No. C-13-01158
  Unjust enrichment and lost profit damages resulting from misappropriation of trade secrets and breach of the parties' non-disclosure agreement with respect to automated manufacturing technology.

Copyright Infringement

- *Energy Intelligence Group, Inc. et. al. v. Mizuho Bank, Ltd.*
  Southern District of New York; Case No. 17-cv-1508
  Calculated economic damages resulting from defendant's alleged copying and unlicensed distribution of a copyrighted energy industry newsletter publication.

- *Anita Kunz v. Rosenblum Associates Inc. d/b/a Rosenblum TV*
  Southern District of New York; Case No. 12-cv-004643
  Royalty damages based on alleged unauthorized use of a copyrighted illustration on a video programming blog.

Breach of Contract

- *Leviton Manufacturing Co., Inc. v. Pass & Seymour, Inc.*
  Eastern District of New York; Case No. 17-46
  Analysis of Secondary Considerations of Non-obviousness and damages for alleged breach of a settlement and license agreement covering patented ground fault circuit interrupter (GFCI) technology.

- *Columbus Regional Airport Authority v. 3M Company*
  American Arbitration Association
  Breach of contract damages resulting from defendant's alleged failure to install and maintain a functioning parking access revenue control system at the Columbus (OH) Regional Airport.

Other

- *M.R., et al. v. Board of School Commissioners of Mobile (AL) County*
  Southern District of Alabama; Case No. 11-cv-0245
  Statistical analysis of student disciplinary records in support of plaintiffs' alleged violation of Fourteenth Amendment due process claims.

- *Deborah Bynum v. Metropolitan Transportation Authority and New York City Transit Authority*
  Eastern District of New York; Case No. 01-cv-7945
  Calculated lost salary and benefits resulting from diminished employment in support of the plaintiff's discrimination claim.

### Select consulting experience

Computer Hardware, Software, and Platform Technologies

- *IP Innovation, et al. v. Red Hat, Inc. and Novell, Inc.*
  Calculated reasonable royalty damages on EDTX patent litigation regarding the alleged infringement of user interface technology in defendants' open source desktop and server software.

- *SCO Group Inc. v. International Business Machines*
  Estimated damages resulting from alleged infringement of the plaintiff's copyrighted UNIX source code by IBM's proprietary AIX operating system.

- *L.A. Taxi Cooperative, Inc. et al v. Uber Technologies, Inc. et al.*
  On behalf of Uber, analysis of website analytics data to rebut plaintiffs' Lanham Act claims.

- *MedioStream, Inc. v. Acer et al.*
  On behalf of defendants, reasonable royalty rebuttal damages resulting from alleged patent infringement. On behalf of counterclaim plaintiff Nero, lost profit and reasonable royalty damages attributable to alleged copyright infringement and trade secret misappropriation.

- *Taiwan Semiconductor Mfg. Co. (TSMC) v. Semiconductor Mfg. Int'l Corp. (SMIC)*
  Calculated damages in rebuttal of the plaintiff's $2 billion trade secret theft and breach of contract claims on next-generation semiconductor technology and manufacturing processes.

- *Nuance Communications v. ABBYY Software House, et al.*
  Calculated lost profits, reasonable royalty, and disgorgement damages resulting from the alleged infringement of Nuance's patents and trade dress with respect to its OCR software.

- *The MathWorks, Inc. v. COMSOL AB*
  Constructed a lost profit damages analysis that modeled various accused program / toolbox sales bundles in support of the plaintiff's copyright infringement claims.

- *Acqis v. Dell, et al.*
  On behalf of Oracle, estimated reasonable royalty damages from the alleged infringement of patented blade server technology.

- *Various IBM patent infringement matters*
  On behalf of IBM, estimated damages resulting from alleged patent and trademark infringement across a broad range of products and technologies, including B2B middleware, business rules management software, post-compiler optimization methods, website memory caching software, semiconductor manufacturing methods, and microprocessors.

Electronics and Telecommunications

- *Rembrandt Wireless Technologies, LP v. Samsung Electronics Co., Ltd., et al.*
  Evaluated plaintiff's damages methodology and constructed a rebuttal analysis measuring the over calculation of damages resulting from plaintiff's flawed assessment of but-for Bluetooth chip prices.

- *Saxon Innovations v. Nokia et al.*
  On behalf of Palm/HP, estimated reasonable royalty damages attributable to the alleged infringement of patents directed to wireless communications privacy methods.

- *BIAX v. NVIDIA and Sony*
  Estimated reasonable royalty damages resulting from infringement of condition register technology allegedly implemented in graphics processors.

- *Konami Digital Entertainment v. Viacom, MTV Networks and Harmonix Music Systems*
  Estimated reasonable royalty damages from the alleged patent infringement of game play technology with respect to Rock Band game consoles.

- *Bally Gaming v. IGT*
  On behalf of the plaintiff, estimated reasonable royalty damages from alleged infringement of patent technology on the sale of the defendant's "Wheel of Fortune" slot machine.

- *LG Display Co. v. AU Optronics Corp.*
  Developed an econometric model describing industrywide patent licensing used to calculate incremental damages among plaintiff and defendant patent cross claims between competitors in the manufacture of LDC panels.

- *Global Communications, Inc. v. DirecTV, Inc. et al.*
  Calculated damages resulting from alleged breach of contract and infringement of patented single wire switching technology implemented in set top boxes for satellite broadcast reception.

- *In the Matter of Certain 3G Capable Wireless Devices (337-TA-800)*
  Analyzed FRAND licensing terms and domestic industry issues regarding standard essential 3G and 4G handset and infrastructure technology patents.

- *Certain Wireless Devices with 3G and/or 4G Capabilities (337-TA-868)*
  Analyzed fair, reasonable, and non-discriminatory (FRAND) licensing terms and domestic industry issues regarding standard essential 3G and 4G handset and infrastructure technology patents.

- *Nokia Corp. v. InterDigital Communications Corp.*
  Estimated damages resulting from the alleged breach of a patent license agreement resulting from a dispute over fair, reasonable, and non-discriminatory (FRAND) royalty terms for a portfolio license

- *Samsung v. InterDigital Communications Corp.*
  Estimated damages for alleged breach of a patent license agreement and dispute over fair, reasonable, and non-discriminatory (FRAND) royalty terms for a portfolio license

*Testimony and Consulting, Page 4 of 6*

- *InterDigital, Inc. v. Huawei*
  Analyzed fair, reasonable, and non-discriminatory (FRAND) licensing and calculated the appropriate royalty payment for a license to InterDigital's standard essential patents.

Pharmaceuticals, Dietary Supplements, and Medical Devices

- *ChromaDex, Inc. v. Elysium Health, Inc. and Mark Morris*
  Analyzed antitrust liability, market definition, and breach of contract damages with respect to the manufacture and sale of an anti-aging dietary supplement

- *In the Matter of Summit Technologies and VISX, Inc.*
  Analyzed antitrust liability and damages with respect to Federal Trade Commission (FTC) allegations of restraint of commerce and monopoly in the sale of technology used in photorefractive keratectomy corneal surgery.

- *Illumina v. Affymetrix*
  Lost profits and price erosion resulting from the alleged infringement of patented high-throughput genotyping array technology.

- *Caliper Technologies Corp. v. Bertram Rowland and Aclara*
  On behalf of the defendants, calculated damages from alleged disclosure of trade secret information directed to microfluidic devices for genetic analysis, drug screening, and clinical diagnostics.

- *Straumann Company v. Lifecore Biomedical*
  Estimated damages from alleged trademark infringement, including rebuttal of the plaintiff's profit disgorgement opinion in competitor litigation involving dental implant screws.

- *VISX, Inc. v. LaserSight, Inc.*
  Lost profit and reasonable royalty damages from alleged infringement of patented refractive laser surgery apparatus and surgical methods.

- *John Taboada v. Stephen L. Trokel and VISX*
  Estimated damages from an alleged inventorship dispute with respect to seminal patents covering refractive laser surgery.

- *In the Matter of Hoechst Marion Roussel, Inc., et al.*
  Analyzed antitrust liability with respect to FTC allegations that the respondents engaged in anticompetitive conduct ("pay for delay") regarding an ANDA submission on a once-a-day diltiazem.

Consumer Goods, Publishing and Broadcasting, and Other

- *Calvin Klein, et al. v. Wachner, et al.*
  Estimated alleged dilution of Calvin Klein trademarks through the sale of namesake jeanswear to unauthorized warehouse clubs.

- *Sterling Jewelers Inc. v. Artistry, LTD*
  Assessed the economic loss resulting from alleged consumer confusion with respect to the use of "artistry" trademark in the sale of mass-market diamond jewelry.

- *Children's Broadcasting v. ABC Radio and The Walt Disney Company*
  Estimated damages to Children's Broadcasting resulting from the defendant's alleged theft of confidential business plans and advertiser information.

- *Sit-Up Ltd. v. IAC/Interactive and HSN International*
  Calculated damages from alleged theft of trade secrets with respect to falling price auctions allegedly acquired during a due diligence investigation involving potential acquisition/merger.

- *Neal Beidleman, et al. v. Houghton Mifflin Harcourt, et al.*
  Copyright infringement rebuttal damages based on unlicensed copies of Beidleman's "rope in wind" and "Doug Hansen approaching the summit" Mt. Everest disaster photographs.

- *Heineken Technical Services, B.V. v. Deco Tec International Ltd., et al.*
  On behalf of plaintiff, estimated damages from alleged theft of bottle labeling technology.

- *In re: Paragon Trade Brands*
  On behalf of Weyerhaeuser, estimated damages owed to a bankruptcy estate based on the alleged breach of an intellectual property asset warranty with respect to Paragon's private label diaper business.

Highly Confidential – Outside Attorney's Eyes Only

**Exhibit 2**
Stock Photography Agencies by Licensing Model and Count of Available Images

| | Agency | Agency Type | Website | Licensing Model | Total Images |
|---|---|---|---|---|---|
| [a] | Getty Images | Macrostock | https://www.gettyimages.com/ | Royalty-Free | 31,700,000 |
| [b] | Alamy | Macrostock | https://www.alamy.com/ | Rights-Managed and Royalty-Free | 263,100,000 |
| [c] | Shutterstock | Microstock | https://www.shutterstock.com/ | Royalty-Free | 370,000,000 |
| [d] | Adobe Stock | Microstock | https://stock.adobe.com/ | Royalty-Free | 241,800,000 |
| [e] | Deposit Photos | Microstock | https://depositphotos.com/ | Royalty-Free | 211,400,000 |
| [f] | 123rf | Microstock | https://www.123rf.com/ | Royalty-Free | 171,400,000 |
| [g] | Dreamstime | Microstock | https://www.dreamstime.com/ | Royalty-Free | 166,000,000 |
| [h] | iStock | Microstock | https://www.istockphoto.com/ | Royalty-Free | 99,300,000 |

*Notes and sources:*
[a]   Getty Images announced in November 2019 that it would be phasing out rights-managed content in favor of royalty-free imagery.
[h]   iStock Photos is owned by Getty Images.

Highly Confidential - Outside Attorneys' Eyes Only

**Exhibit 3**
Single Payment and Subscription Based Fixed Fees: Royalty-Free Image Pricing Model

| Agency | [1]<br>Extra-Small | [2]<br>Small | [3]<br>Medium | [4]<br>Large | [5]<br>Extra Large | [6]<br>Extra-Extra Large |
|---|---|---|---|---|---|---|
| **Single Payment Model** | | | | | | |
| [a] Getty Images | $50.00 | $175.00 | $375.00 | $499.00 | n/a | n/a |
| [b] Alamy | $49.00 | $95.00 | $190.00 | $245.00 | $315.00 | $365.00 |
| **Subscription Model** | | | | | | |
| [c] Shutterstock | $0.27 - $14.50 | $0.27 - $14.50 | $0.27 - $14.50 | $0.27 - $14.50 | $0.27 - $14.50 | $0.27 - $14.50 |
| [d] Adobe Stock | $0.27 - $79.99 | $0.27 - $79.99 | $0.27 - $79.99 | $0.27 - $79.99 | $0.27 - $79.99 | $0.27 - $79.99 |
| [e] Deposit Photos | $0.27 - $89.99 | $0.27 - $89.99 | $0.27 - $89.99 | $0.27 - $89.99 | $0.27 - $89.99 | $0.27 - $89.99 |
| [f] 123rf | $0.36 - $115.00 | $0.36 - $115.00 | $0.36 - $115.00 | $0.36 - $115.00 | $0.36 - $115.00 | $0.36 - $115.00 |
| [g] Dreamstime | $0.19 - $26.50 | $0.19 - $26.50 | $0.19 - $26.50 | $0.19 - $26.50 | $0.19 - $26.50 | $0.19 - $26.50 |
| [h] iStock | $0.22 - $252.00 | $0.22 - $252.00 | $0.22 - $252.00 | $0.22 - $252.00 | $0.22 - $252.00 | $0.22 - $252.00 |

*Notes and sources:*

[c]   Shutterstock offers subscription based plans and on-demand packs. An on-demand pack for 2 images is $29, therefore $14.50 per image. A $199 per month subscription plan allows for 750 images per month, or $0.27 per image.

[d]   Adobe Stock offers subscription based plans, on-demand credit packs, and extended licenses. An extended license for an image is $79.99. A $199 per month subscription plan allows for 750 images per month, or $0.27 per image.

[e]   Deposit Photos offers subscription based plans, on-demand credit packs, and extended licenses. An extended license for one image is $89.99. A $199 per month subscription plan allows for 750 images per month, or $0.27 per image.

[f]   123rf offers subscription based plans, on-demand credit packs, and extended licenses. An extended license for one image is $115.00. A $1,519 annual subscription plan allows for 350 images per month, or $0.36 per image.

[g]   Dreamstime offers subscription based plans, on-demand credit packs, and extended licenses. An extended license for two images is $53, or $26.50 for one image. A $1,724 annual subscription plan allows for 750 images per month, or $0.19 per image.

[h]   iStock offers subscription based plans, on-demand credit packs, and extended licenses. An extended license 21 credits, or $252. A $166 monthly subscription plan allows for 750 images per month, or $0.22 per image.

Highly Confidential – Outside Attorneys' Eyes Only

**Exhibit 4**
Count of Licensable Pigeons Flying Images by Agency and Licensing Model

|  | Keyword Search | Rights-Managed Photos | Royalty-Free Photos | Total Photos | Rights-Managed % |
|---|---|---|---|---|---|
| [a] | Getty Images | 0 | 3,583 | 3,583 | 0.0% |
| [b] | Shutterstock | 0 | 33,694 | 33,694 | 0.0% |
| [c] | Alamy | 15,380 | 11,899 | 27,279 | 56.4% |
| [d] | Adobe Stock | 0 | 52,303 | 52,303 | 0.0% |
| [e] | Deposit Photos | 0 | 14,658 | 14,658 | 0.0% |
| [f] | 123rf | 0 | 13,622 | 13,622 | 0.0% |
| [g] | Dreamstime | 0 | 15,655 | 15,655 | 0.0% |
| [h] | iStock | 0 | 32,636 | 32,636 | 0.0% |

*Notes and sources:*
"Flying pigeon" was the keyword search performed on each website. Counts exclude photographs intended for editorial use only.
[a]   383 of these photographs, all royalty free, were tagged "isolated" (i.e., isolated objects are objects that have been extracted from an image for use in any design.)
[d]   2,711 of these photographs, all royalty free, were tagged "isolated" by the artist.
[e]   1,591 of these photographs, all royalty free, were tagged "isolated" by the artist.

# PROOF OF SERVICE

*Dennis Fugnetti Photography Trust v. Bird-B-Gone, Inc.*
USDC – Central Case No. 8:19-cv-00847

     I am employed in Orange County, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 2603 Main Street, Suite 1000, Irvine, CA 92620.

On August 18, 2021, I served the following document(s) described as:

## DEFENDANT BIRD-B-GONE, INC.'S SUPPLEMENTAL EXPERT DAMAGES REPORT OF PETER SCHWECHHEIMER

on the following parties or attorneys for parties in this action:

Ryan Carreon
rcarreon@higbeeassociates.com
Mathew K. Higbee, Esq.
mhigbee@higbeeassociates.com
Law Firm of Higbee & Associates
1504 Brookhollow Dr., Suite 112,
Santa Ana, CA 92705

☐   **BY REGULAR MAIL.**  I caused such envelopes to be deposited in the United States mail, at Irvine, California with postage thereon fully prepaid, individually addressed to the parties as indicated on the attached service list. I am readily familiar with the firm's practice of collection and processing correspondence in mailing.  It is deposited with the United States postal service each day and that practice was followed in the ordinary course of business for the service herein attested to. (C.C.P. § 1013(a)(3))

☐   **BY OVERNIGHT DELIVERY.**  I deposited such document(s) in a box or other facility regularly maintained by an overnight delivery service or delivered such document(s) to a courier or driver authorized by said overnight delivery service to receive documents, in an envelope or package designated by the overnight delivery service with delivery fees paid or provided for to the addressees on the attached service list.

**X**   **BY ELECTRONIC MAIL.**  I caused a true copy of the foregoing document to be sent via electronic mail in .pdf format, to the individual(s) listed on the above service list.

☐   **BY PERSONAL SERVICE.**  I caused such envelope to be delivered by hand to the addressee listed on the attached service list

     I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

     Executed on August 18, 2021, at Anaheim, California.

Brittany Nobles

1

CERTIFICATE OF SERVICE

# PROOF OF SERVICE

*Dennis Fugnetti Photography Trust v. Bird-B-Gone, Inc.*
USDC – Central Case No. 8:19-cv-00847

I am employed in Orange County, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 2603 Main Street, Suite 1000, Irvine, CA 92620.

On August 18, 2021, I served the following document(s) described as:

## DEFENDANT BIRD-B-GONE, INC.'S SUPPLEMENTAL EXPERT DAMAGES REPORT OF PETER SCHWECHHEIMER

on the following parties or attorneys for parties in this action:

Ryan Carreon
rcarreon@higbeeassociates.com
Mathew K. Higbee, Esq.
mhigbee@higbeeassociates.com
Law Firm of Higbee & Associates
1504 Brookhollow Dr., Suite 112,
Santa Ana, CA 92705

☐ **BY REGULAR MAIL.**  I caused such envelopes to be deposited in the United States mail, at Irvine, California with postage thereon fully prepaid, individually addressed to the parties as indicated on the attached service list. I am readily familiar with the firm's practice of collection and processing correspondence in mailing.  It is deposited with the United States postal service each day and that practice was followed in the ordinary course of business for the service herein attested to. (C.C.P. § 1013(a)(3))

☐ **BY OVERNIGHT DELIVERY.**  I deposited such document(s) in a box or other facility regularly maintained by an overnight delivery service or delivered such document(s) to a courier or driver authorized by said overnight delivery service to receive documents, in an envelope or package designated by the overnight delivery service with delivery fees paid or provided for to the addressees on the attached service list.

**X** **BY ELECTRONIC MAIL.**  I caused a true copy of the foregoing document to be sent via electronic mail in .pdf format, to the individual(s) listed on the above service list.

☐ **BY PERSONAL SERVICE.**  I caused such envelope to be delivered by hand to the addressee listed on the attached service list

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.  I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on August 18, 2021, at Anaheim, California.

Brittany Nobles

1
CERTIFICATE OF SERVICE